JERRY S. WILSON *vs.* THE WILLIMANTIC LINEN COM-
PANY.

A master is bound to provide for his servant a reasonably safe place for his
work and reasonably safe appliances.

Where, instead of attending personally to it he employs another, who does
it negligently, so that the servant receives an injury by reason of the
negligence, the master is equally liable.

The general rule that a servant can not recover for an injury caused by the
negligence of a fellow-servant has no application to such a case.

While it is the duty of a servant to use ordinary care in noticing the condi-
tion of machinery at which he is working, yet he can not be expected to
notice latent defects or any that are not obvious to one not an expert in
machinery.

If a servant has been guilty of negligence in such a matter, yet it must be
negligence essentially contributing to the injury.

A manufacturing corporation employed a superintendent who had charge
of all its machinery and works in several mills. Under him and appointed
by him were overseers of the several rooms, whose duty it was to keep
watch of the machinery and oversee the work in their respective rooms.
These overseers appointed second-hands whose duty it was to act as
overseers of the rooms in their absence. There was also an overseer of
repairs, whose duty it was to make repairs on notice from the super-
intendent or overseer of a room that repairs were needed. Some new
machinery having been procured the person setting it up notified the
superintendent that collars were needed on certain countershafts before
they were used, and the superintendent notified the overseer of repairs to
put them on, but through negligence he failed to do so, and by reason of
the want of a collar a countershaft fell and injured the plaintiff, an
employee in the room. Held that the negligence was that of the corpora-
tion and that it was liable for the injury.

And held to make no difference that the plaintiff was not using the
machine as an operative at the time of the injury, but was assisting the
overseer of the room by his direction in setting up the countershaft pre-
paratory to its being used by the operatives.

CIVIL ACTION for an injury to the plaintiff, an employee
of the defendants, by means of defective machinery; brought
to the Superior Court in Windham County. The defend-
ants suffered a default and were heard in damages before
*Hovey, J.* The court found the facts and gave its opinion
and judgment upon them as follows:—

At the time of the injury the defendants were and for

VOL. L.—28

some time had been a corporate body, engaged in the
business of manufacturing cotton thread and spools by
means of machinery operated by water power, and for that
purpose employing numerous servants and workmen, in the
village of Willimantic in the town of Windham. Their
property and affairs, during that time, were under the
government and direction of a board of nine able and com-
petent directors, one of whom was president and another
vice-president; but none of them, except the vice-president,
exercised any personal supervision of the manufacturing
department of the corporation. He was the general manager
of the corporation, and was a competent and in all respects
a fit and suitable person for that position. In the manu-
facturing department, the officer next in rank or grade to
the general manager was the resident agent. He had the
direct charge of the property of the corporation in Willi-
mantic and was directly responsible to the general manager
that the property and the men in the employ of the corpor-
ation were, each in their way, doing their proper work. He,
also, was a fit person in all respects for his department. The
first person in charge under him was known as the superin-
tendent. He was the manufacturer and also the master
mechanic of the corporation. He had the direct charge of
all the machinery of the corporation and its construction
and use, and was a competent and suitable person for the
place. He had had a large experience in the business and, in
cotton manufacturing in New England, was at the head of
his profession. The corporation then had in Willimantic
four cotton mills, known as mills Nos. 1, 2, 3 and 4 respec-
tively, and one spool-shop, in which their business of manu-
facturing was carried on; and of all these mills the super-
intendent, in his department, had the general charge. The
several rooms in each mill, the shafting, countershafting and
machinery, and the persons employed to do the work therein,
were in the immediate charge of overseers appointed and
employed, in behalf of the corporation, by the superintend-
ent, and of persons called second-hands, employed by the
respective overseers with the approval of the superintendent,

to act when the overseers were absent. There was also in the service of the corporation an overseer of repairs, who was a competent and fit person for the position. The overseer of each room was entrusted by the superintendent with the power to employ the necessary servants or help to do the work required to be done in his room, and to discharge those whom he might deem unfit or unnecessary. It was his duty at all times to see that his room was clean and in order, that the persons there employed were performing their respective duties, that each machine was fulfilling its work, and that if any machine or any shaft in his room required repairs, to notify the overseer of repairs, and if he did not make the repairs, to notify the superintendent. But it was no part of his duty to procure, put up or set new or repair old machinery, shafting or countershafting. Those duties were devolved upon the superintendent, or the overseer of repairs under the superintendent's direction. When new countershafts were hung and new machines were set in any room and pronounced by the parties hanging or setting them, or by the overseer of repairs, to be ready for use, but not before, they came under the charge of the overseer of that room. It was then the duty of the overseer to start up the machines and put them in operation, and for that purpose to connect them by means of belts with the countershafts and to connect the countershafts by the same means with the main shaft. But, before doing so, it was his duty to examine the several machines and see that the rolls were all right and that the rails were free and traversed easily; also to set the traverses and to see that they were all properly oiled and that the rails were properly balanced. It was also his duty to see that the countershafts were in a fit condition to run and that the necessary belts were made and properly put on. If he discovered any defect in the countershafts or machines, which he could not remedy, it was his duty to report the same immediately to the superintendent or to the overseer of repairs. If the report was made to the superintendent, it was his duty to notify the overseer of repairs, and it was the duty of the overseer of

repairs on receiving the notice from the superintendent, or directly from the overseer in charge of the defective shafting or machinery, to remedy the defect or the defects and make the necessary repairs. The duty of the second-hand was to do whatever the overseer, when present, required him to do, and in his absence to take his place and perform his duties.

In the month of May or June, 1880, the defendants remodeled the attic room of mill No. 1, and caused to be placed therein some new countershafts and some new spinning frames. The countershafts were hung nine feet above the floor of the room. Some of them were straight shafts, being of an uniform diameter their entire length, and were set in open end hangers. Collars were required on those shafts to hold and keep them in position and prevent them, when in motion, from slipping out of the hangers and falling to the floor. Without collars they were incomplete, imperfect and dangerous to those who might attempt to use or belt them. Some other of the new countershafts were set in open end hangers but were kept in position by shoulders turned at each end. Those could be distinguished from the straight shafts, when the latter were without collars, only upon a careful inspection. And other countershafts were set in hangers closed at the outer end, and those were called closed end hangers. The hangers were put up and the new countershafts were set by parties competent to do the work, according to plans or drawings prepared by order of the superintendent, and under the immediate supervision of the overseer of repairs. But some of the straight shafts were set in open end hangers without collars, and were left in that condition by the parties who set them, because the overseer of repairs, whose duty it was to furnish the collars, had not a sufficient supply on hand for the purpose. Notice of the fact was promptly given to the superintendent by the party who set the shafts, and the superintendent at once notified the overseer of repairs and ordered him to make the collars and put them on. Collars were accordingly put on some of the shafts

that needed them by the overseer of repairs; but others, through his negligence, remained without collars for a period of from four to six weeks after the order to put them on was given by the superintendent, and until after the plaintiff sustained the injuries of which he complains. During that period and before, Philip Wilson, the father of the plaintiff, was the overseer of the room in which those shafts were set and William L. Kenyon was his second-hand. They were competent and fit persons for those positions, but neither of them was informed or had knowledge of the defective condition of the shafts. Wilson was directed by the superintendent to start up the new spinning frames in his room as soon as they should be set and in readiness for use. The frames were properly set and in readiness for use a short time before the 19th of August, 1880. On the 18th of August, 1880, the plaintiff was employed by Wilson, in behalf of the defendants, to assist in starting up the new frames the next day and, after that, to act as his second-hand; and he entered upon the performance of his duties in the morning of August 19th, 1880. The compensation to be paid him was ten dollars a week. He had previously worked in that room about eight years, ending some time in 1879, and the last three of those years he acted as the second-hand of his father. In the morning of August 19th, 1880, he and one Horn, another employee of the defendants in Wilson's room, were directed by Wilson and by Kenyon his second-hand, to prepare the necessary belts to connect the new countershafts with the new spinning frames and put them on and start up the frames as soon as they could, as the defendants were in a hurry for the yarn that was to be spun upon those frames. In obedience to that direction they commenced work between 7 and 8 o'clock in the morning, and in the course of the forenoon prepared belts for and belted two or three frames and got them ready to start.

At noon, when the machinery in the mill was stopped, the overseer of repairs, at the request of Wilson, examined the pulleys on one of the countershafts and set them, or saw

that they were set, in range with the pulleys on the spinning frames that that shaft was to drive, and with the pulleys on the main shaft.    It was his duty to see that the pulleys were properly set, and that the shaft was ready for the belting, and ready to be connected with the spinning frames.    After he had made the examination and set the pulleys, as requested, Wilson inquired of him if they were all right, and on receiving the reply that they were, caused the countershaft to be connected by a belt with the main shaft.

The countershaft was a straight shaft, set in open end hangers without collars; but that was not noticed by the overseer of repairs, notwithstanding the order given him more than a month before to supply the shafts of that description with collars; nor had it been noticed by the overseer of the room or his second-hand, nor by the superintendent in his visits to that room, which had been made daily, sometimes twice or thrice in a day, from the time the shaft was hung.    But Wilson, the overseer, supposing, from what the overseer of repairs had said to him, that the countershaft was complete and in a proper condition to be connected with the frames it was to drive, did not examine it to see whether it needed collars, but directed the plaintiff and Horn to put on the belts from the countershaft to the frames and start up the frames in the afternoon.    They accordingly prepared the belts, and in the afternoon, while they were attempting to put one of them on a pulley of the countershaft which was in motion, and thus connect the countershaft with one of the spinning frames, the shaft, for the want of collars, was thrown from its bearings and out of one of the hangers in which it was set, and, breaking the other hanger, fell and struck the plaintiff and inflicted upon him severe and permanent injuries.    The plaintiff had no knowledge or information that the shaft needed collars, but supposed and believed that it was complete and ready to be put in operation.    Nor had he any knowledge or information that it was his duty, before attempting to connect the shaft with the spinning frame, to examine the shaft and see that it was in such a condition that the connection could be

safely made ; though it was proved to be the understanding among mill-owners and those having charge of mills and of their several departments, that it is the duty, not only of overseers and second-hands, but also of every person who is employed and directed to connect shafting with machinery, to see that every thing is in a proper condition before attempting to make the connection, and that if they fail to do so they are guilty of negligence.

Upon these facts the plaintiff claims that he is entitled to recover of the defendants substantial damages. This claim is resisted by the defendants, who insist that nominal damages only should be assessed against them, because, they claim, that the injuries sustained by the plaintiff were caused, not by any neglect or fault on their part, but by the negligence of the plaintiff's fellow-servants. They further claim that if they were chargeable with the negligence of the overseer of repairs in leaving the shaft that fell without collars, or the negligence of the overseer of the room in which the shaft was hung in not ascertaining the condition of the shaft before he directed it to be belted to the frame it was intended to drive, they cannot be subjected to more than nominal damages, because, they claim, that the negligence of the plaintiff essentially contributed to produce the injuries.

The judicial decisions in this country and in England have firmly established the rule that a master is not liable for injuries sustained by one of his servants through the negligence of another, while both are engaged in the same general business, unless the servant by whose negligence the injuries were occasioned was incompetent or otherwise unfit for the duty or work he was employed and called upon to perform, and his employment is attributable to the want of reasonable care on the part of the master. The rule is founded upon considerations of public policy and upon the obviously just and rational principle that one who engages in the employment of another for the performance of specified duties and services for compensation, assumes and takes upon himself the natural and ordinary risks and perils inci-

dent to the nature of his employment, including his liability to injury from the negligence of those who, with due care on the part of the master, have been employed as his fellow-servants. And the rule applies not only in those cases in which the servant injured is engaged in the same grade of employment as the servant whose negligence occasioned the injury, but also in cases in which the two servants are engaged in different grades of employment, if the services of each are directed to the same general end. It also applies to cases where the injured servant is of a grade of the service inferior to that of the servant whose negligence occasioned the injury, though the inferior in grade is subject to the direction of the superior. And it is not essential in order to exempt the master from liability that the injured servant, at the time of receiving the injury, should be engaged in the same particular work as the servant by whose negligence the injury was occasioned. If both servants are in the employment of the same master, work under the same control and in the same general business, and derive authority and compensation from the same common source, the master is not liable. But this rule has no application where a servant sustains an injury through the master's negligence alone, or through the negligence of the master combined with the negligence of a fellow-servant. The reason is that the servant, though assuming and taking upon himself, as incidental to his employment, the risks of injury from the negligence of fellow-servants while engaged in the same general business, does not agree to take the risks or chances of any negligence on the part of the master. The master is bound to exercise reasonable care to provide, for the use of his servants and for their protection and security, suitable machinery, implements, materials and appliances, and to employ as their associates and co-laborers none but fit and competent persons; and if he fail to perform those duties and in consequence of such failure any of his servants are injured, he will be responsible for the injuries, though the negligence of a fellow-servant contributed to produce them. Contributory negligence, to defeat a

right of action in such a case, must be the negligence of
the party injured. That the defendants exercised proper
care and thus performed their duty in the selection and
employment of agents and servants for the prosecution of
the business in which they were engaged, is not and cannot
be questioned. Their general manager, their resident agent,
their superintendent, their overseer of repairs, their over-
seer of the room in which the plaintiff was injured and his
second-hand, were competent and in all respects fit persons
for their respective positions; and there was no evidence or
claim that any of their subordinate servants or employees
were incompetent or otherwise unfit for the duties with
which they were entrusted. But the important duty im-
posed by law upon the defendants, of exercising reasonable
care to provide for the use of their servants in the attic
room of mill No. 1, suitable machinery, implements and
appliances, was not performed, unless performance was
effected by the order of the superintendent to the over-
seer of repairs to supply the shaft that fell with the neces-
sary collars. Performance could not, however, be effected
by the giving of an order, but only by doing the act which
the order commanded to be done. "That some general
agent, clothed with the power and charged with the duty
to make performance for the master, has not done his duty
at all, or has not done it well, neither shows a performance
by the master nor excuses the master's non-performance. It
is for the master to do, by himself or some other. When it
is done, then, and not till then, his duty is met or his con-
tract kept. The servant then takes the risk of the negli-
gence, recklessness or misconduct of his fellow in the use
of the materials and implements, and of their failure from
latent defects not revealed by practical tests, and from dete-
rioration by the usual wear and tear. It is not enough to
satisfy the affirmative duty or contract of the master that
he selects one, or more than one, general agent of approved
skill and fitness. If the general agent goes forward and
carelessly places by the side of a servant another unskilled
and incompetent, the duty of the master has not yet been

met, his contract is yet unperformed. Corporate bodies must, of the necessity of their being, act through agents; and in the large enterprises and business pursuits of the times, the necessity is almost as stringent upon very many other employers. But they may not avoid the duty which they owe to their servants, of furnishing them with sound mechanical contrivances, and accompanying them with competent fellows, by conferring upon superior servants the duty of selecting, purchasing or hiring. The duty being that of principals, and theirs the contract, it is theirs to fulfill and perform; and if it is not done or is insufficiently done, the failure to do is theirs." *Laning* v. *N. York Central R. R. Co.*, 49 N. York, 521. The overseer of repairs was the person specially charged with the duty of putting the defective shaft in a safe and proper condition. He was, for that purpose, the agent of the defendants, though subject to the orders of the superintendent. He had actual knowledge that the shaft was without collars and, for that reason, could not be put in operation with safety. He was ordered by the superintendent to make the collars and put them on. No one else was authorized or empowered for the purpose, and he alone was relied upon by the defendants to perform the duty. And although he was, for that purpose, a servant as well as an agent of the defendants, he was not, in any legal sense, a fellow-servant of the plaintiff. On the contrary, within the sphere of his employment he represented and stood in the place of the defendants; and his duties were those which the law cast upon them. Within the same sphere, his knowledge was their knowledge, his acts were their acts, his omissions their omissions, and his negligence their negligence. To provide machinery for a mill and put it in a fit condition for use, and to use it after it is provided and put in that condition, are widely distinct matters. They are not employments in the same general business. The one can properly be said to begin only when the other ends. The agent or servant who provides and puts up the machinery, shafting or implements, and the servant who afterwards uses them for the purposes for which

they are provided and put up, may work under the same master and receive their compensation from the same common source, but this is not sufficient to constitute them fellow-servants in the legal sense. They must, in order to give them that character and establish that relation between them, be, at the time, engaged in a common purpose or employed in the same general business. *Shanny* v. *Androscoggin Mills*, 66 Maine, 420. The defendants are, therefore, liable for the injuries complained of by the plaintiff, and the plaintiff is entitled to substantial damages therefor, unless his own negligence essentially contributed to produce them. If this were not the rule, and the doctrine should be upheld that the overseer of repairs, in performing his duties, was the fellow-servant of the plaintiff, a corporation and any employer who carries on his business through general superintendents or agents, would, in most cases, be exempt from liability to servants for injuries occasioned by imperfect and defective machinery, by unsafe mechanical means and appliances of any kind, and by incompetent, unskilful and otherwise unfit sub-agents, selected and provided without reasonable care; a result which no court ought to sanction or sustain.

The question then remains, whether the negligence of the plaintiff essentially contributed to produce the injuries of which he complains. The defendants impute to him negligence of that character, because of his omission to examine the shaft that fell and injured him, before he attempted to connect it with the machinery it was intended to drive; and the imputation would, perhaps, be deserved, if the plaintiff had known that it was the duty of every person employed to connect shafting with machinery to make such an examination. But he had no such knowledge. Whose fault it was that he was ignorant did not appear; it was probably the fault of his father, who was the overseer of the room in which he was employed. But, whether the fault was his or that of some other person, the plaintiff is not chargeable with contributory negligence for omitting to do an act which he had never been apprised it was his duty

to perform. No other contributory negligence being imputed to the plaintiff by the defendants, and none being disclosed by the evidence, this question, like the other questions in the case, must be decided in favor of the plaintiff.

The conclusion therefore is, that the injuries sustained by the plaintiff resulted from the negligence of the defendants and the negligence of Wilson the overseer combined, and that the plaintiff is not chargeable with contributory negligence. It follows that the plaintiff is entitled to judgment for substantial damages, which the court assesses at three thousand dollars.

From this judgment the defendants appealed to this court, assigning the following errors:

1. That upon the facts found the court should have found as matter of law that the plaintiff was guilty of contributory negligence.

2. That upon the finding the court held that even if the plaintiff had been guilty of contributory negligence in not examining the shafting before connecting it with the machine, yet he could recover if he did not know that it was his duty so to examine the same.

3. That the court erred in holding upon the facts found that the master mechanic and overseer were not both the fellow-servants of the plaintiff.

*J. J. Penrose* and *C. E. Perkins*, with whom was *J. M. Hall*, for the appellants.

Three questions are presented by this appeal: 1st. Was the plaintiff guilty of contributory negligence, and if so was this excused by the fact that he did not understand his duty? 2d. Was there negligence on the part of the defendants, they having been found to have employed competent servants to do the necessary work? 3d. Were not the overseer of repairs and the overseer of the room, by whose negligence the accident occurred, both fellow-servants of the plaintiff?

1. Was the plaintiff guilty of contributory negligence? The nature of his employment at the time of the accident

distinguishes this case from a large number of cases reported in the books. He was employed, not to labor on machinery already prepared and ready for the operative, but to assist in starting up new machines and putting them in order and making them safe for those who were afterwards to operate them. He had worked in the same room eight years, and the last three years had occupied the position of second-hand. A second-hand was required to take the place and perform all the duties of the overseer in his absence. He was therefore bound to understand the duties of an overseer. The court finds that "it was the duty of the overseer to start up the machines and put them in operation, and for that purpose to connect them by means of belts with the countershafts, and to connect the countershafts by the same means with the main shaft. But before doing so it was his duty to examine the several machines and see that the rolls were all right and that the rails were free and traversed easily; also to set the traversers and see that they were all properly oiled and that the rails were properly balanced; also to see that the countershafts were in a fit condition to run, and that the necessary belts were made and properly put on. If he discovered any defect in the countershafts or machines which he could not remedy, it was his duty to report the same immediately to the superintendent or to the overseer of repairs." It is also found that "he was employed by Wilson, the overseer, in behalf of the defendants, to assist in starting up new frames the next day, and after that to act as his second-hand." The plaintiff was bound to exercise all reasonable care and prudence. Wood's Master & Servant, § 372. But he made no examination whatever of the countershafts with which he was connecting the frame and which was to furnish it motion. The finding admits that he did not examine the shaft and that this would have been negligence in an overseer or a second-hand, but holds that the plaintiff is freed from liability arising from his neglect because he did not know that it was a part of his duty to make such an examination. This part of the case therefore presents this question: Can

a servant excuse himself for an accident arising from his neglect of his duty, because he did not know what his duty was? The bare statement of the proposition illustrates its absurdity. The servant is bound to know his duty. The contract creates this obligation. There is in every contract of service a promise, either expressed or implied, that the party employed will not only use due care and diligence, but that he also possesses the skill and knowledge requisite for the service he undertakes. 2 Parsons on Cont., 54, Story on Bailm., §§ 432, 433; *Morris* v. *Redfield*, 23 Verm., 295; *Goslin* v. *Hodson*, 24 id., 140; *Hall* v. *Cannon*, 4 Harring. (Del.), 360; *Hager* v. *Nolan*, 6 Louis. Ann., 70; *Bowman* v. *Woods*, 1 Greene (Iowa), 441. If ignorance of duty can avail to excuse the plaintiff, why cannot the same excuse be always available to shield a defendant? That the plaintiff assumed, in accepting the employment, all the ordinary risks and perils incident to the performance of the specific work he was employed to perform, is well settled. *Hayden* v. *Smithville Manf. Co.*, 29 Conn., 548; *Noyes* v. *Smith*, 28 Verm., 59; *Nashville & Chat. R. R. Co.* v. *Elliott*, 1 Coldw., 611; *Priestley* v. *Fowler*, 3 Mees. & Wels., 1. The ordinary risks include the negligent acts of his fellow-workmen in the course of the employment. *Coombs* v. *New Bedford Cordage Co.*, 102 Mass., 572; *Lovell* v. *Howell*, L. Reps., 1 Com. P. Div., 161. But independent of the legal obligations incident to the contract of employment and the risks assumed in the performance of the specific work he undertook, the court finds that it was proved "that it is the duty not only of overseers and second-hands, but also of every person who is employed and directed to connect shafting with machinery, *to see that everything is in a proper condition to run before attempting to make the connection*, and that if they fail to do so they are guilty of negligence. The fact found that the overseer Wilson misunderstood what the overseer of repairs said about the countershafts, and supposed they had been put in a proper condition to run, does not affect the question. It does not appear that the plaintiff knew that the overseer of repairs had made

any examination, and therefore it was no excuse for his failure to perform his duty in making an examination himself before starting the frame. If this accident had happened to a spinner using the frame after it was set up, it might be said with more weight that there was no contributory negligence on his part, because it was no part of his duty to see that the machinery was in proper condition to run, but the very purpose for which the plaintiff was employed was to make the machinery safe for the spinner. If this accident had happened to the spinner, he would have had a cause of action against the plaintiff for not properly performing his duty, and it is clear that in such case the plaintiff could not have pleaded his ignorance of his duty to excuse himself from liability. *Atchison, &c. R. R. Co.* v. *Plunkett*, 25 Kan., 188. From all the facts found it seems impossible to escape the conclusion that the plaintiff was guilty of contributory negligence, and therefore should recover in this case nominal damages only.

2. Were the defendants guilty of negligence? The finding on this point is as follows:—" That the defendants exercised proper care and thus performed their duty in the selection and employment of agents and servants for the prosecution of the business in which they were engaged, is not and cannot be questioned. Their general manager, their resident agent, their superintendent, their overseer of repairs, their overseer of the room in which the plaintiff was injured, and his second-hand, were competent and in all respects fit persons for their respective positions; and there was no evidence or claim that any of their subordinate servants or employees were incompetent or otherwise unfit for the duties with which they were entrusted." The duty of the master is performed when he employs competent servants to do the necessary work. *State* v. *Malster*, 57 Maryl., 287, 307; *Mansfield Coal Co.* v. *McEnery*, 91 Penn. St., 185, 191; *Columbus &c. R. R. Co.* v. *Arnold*, 31 Ind., 174; *Harrison* v. *Central R. R. Co.*, 31 N. Jer. Law, 293, 299; *Hard* v. *Verm. & Canada R. R. Co.*, 32 Verm., 473; *Gunter* v. *Granite Co.*, 15 So. Car., 443, 457; *Knox-*

*ville Iron Co.* v. *Dobson*, 7 Lea (Tenn.), 367; *Columbus &c. R. R. Co.* v. *Webb*, 12 Ohio St., 475, 494; *Smith* v. *Potter*, 46 Mich., 258, 263; *Slater* v. *Jewett*, 85 N. York, 61; *Holden* v. *Fitchburg R. R. Co.*, 129 Mass., 268; *Malone* v. *Hathaway*, 64 N. York, 5; *Murphy* v. *Boston & Albany R. R. Co.*, 88 id., 146; *Wilson* v. *Merry*, L. Reps., 1 House of Lords Cas. Scotch App., 326; *Lovell* v. *Howell*, L. Reps., 1 Com. Pleas Div., 161, *Allen* v. *New Gas Co.*, L. Reps., 1 Exch. Div., 251. " In all cases the question is one of reasonable care and diligence on the master's part, and unless the master has expressly contracted to superintend his business in person, or the duty is absolute, there is no implied condition that he will do so, and he may delegate that power to others, using due care to select competent persons. A doctrine that held the master to any other rule of liability would be destructive of the best interests of society, and would impose such severe burdens upon employers as would tend seriously to embarrass and retard the growth and development of industrial pursuits."—Wood's Master & Servant, § 411, and cases there cited. " If the master has given such orders to the proper servants as would prevent any harm from being done by dangerous or defective materials, he is exonerated from liability to them, and to all his other servants in the same general employment." Shearm. & Redf. on Neg., § 92. It is submitted with confidence that all the English cases, and the weight of the leading American authorities, fully support this doctrine. In a state like Connecticut, filled with manufacturing and other corporations affording employment to vast numbers of our people, and necessarily carrying on their business by servants and agents, the adoption of any other rule of liability would work peculiar hardship.

3. The accident resulted from the negligence of the plaintiff, combined with the negligence of the overseer of the room and the overseer of repairs. Both these overseers were fellow-servants of the plaintiff. It appears from the finding that the plaintiff was employed not to use the machines, but to set them up, ready for use. All the authori-

ties relating to the duty of the master to furnish proper machinery, relate to their duty to the persons who were to *use* the machinery and not to those who were to set it up to be used by others. The overseer of repairs was a fellow-servant of the plaintiff, because they were both engaged in the service of preparing machinery to be used. If this accident had happened to the spinner using the frames, it might be said with more weight that the overseer of repairs was not a fellow-servant of his, because they were engaged in different occupations; but in this case it was the duty of both the overseer of repairs and the overseer of the room, as well as of the person setting up the machine, to see that the countershaft was fit to start, and where persons have a common duty they are fellow-servants. Supposing the overseer of the room had been the person injured while setting up frames and connecting them with countershafts. It was his duty equally with the overseer of repairs to see that the countershafting was in order, and the plaintiff stands in the same position as the overseer of the room. And it makes no difference that the servant, whose negligence occasioned the injury, is a sub-manager or foreman or overseer of higher grade or greater authority than the plaintiff. *Hayes* v. *Western R. R. Co.*, 3 Cush., 270; *Albro* v. *Agawam Canal Co.*, 6 id., 75; *Sherman* v. *Rochester & Syracuse R. R. Co.*, 17 N. York, 153; *Slater* v. *Jewett*, 85 id., 61; *Farwell* v. *Boston & Wor. R R. Co.*, 4 Met., 49; *Brown* v. *Winona & St. Peter R. R. Co.*, 27 Minn., 162; *Lawler* v. *Androscoggin R. R. Co.*, 62 Maine, 463; *Weger* v. *Pennsylvania R. R. Co.*, 55 Penn. St., 460; *Searle* v. *Lindsay*, 11 Com. Bench, N. S., 429; *Brown* v. *Accrington Cotton Co.*, 3 Hurlst. & Colt., 511; *Murphy* v. *Pollock*, 15 Irish C. L., 224; *Feltham* v. *England*, L. Reps., 2 Q. B., 33; *Howells* v. *Landore Steel Co.*, L. Reps., 10 Q. B., 62; *Wilson* v. *Merry*, (supra). The court below however held that the negligence of the overseer of repairs in not putting proper collars on the countershaft to keep it in place, was the negligence of the corporation. He admits that if that overseer had been a fellow-servant of the plaintiff, the corporation would not have been liable, but he

holds that he was not such a fellow-servant, that legally he was the corporation, so that his negligence was that of the corporation. His reasoning is this:—The corporation was bound to exercise reasonable care to provide suitable appliances for its servants to use. As a corporation can act only by agents, *any person* who was relied upon to perform this duty was the agent of the corporation for that purpose, and was for that purpose the corporation itself, and his negligence was that of the corporation. The overseer of repairs therefore was not a fellow-servant of the plaintiff at all, but was the master. To maintain this view of the law the court quotes from *Laning* v. *N. York Central R. R. Co.*, 49 N. York, 521. We submit that the quotation from that case is not law, and if it were it does not apply to the case at bar. The facts in it were that the defendant corporation had deputed its whole power of hiring servants in a certain department of business to an agent, Colby, who had hired a foreman and other persons under him to put up a scaffold. This foreman, though competent when hired, became drunken, which was known to Colby, and by his drunkenness the scaffold was improperly put up; it fell and the plaintiff was injured. The court held that the negligence of the foreman was *not* the negligence of the company, but that the knowledge of Colby of the foreman's drunkenness was the negligence of the company, because he had the sole power of employing and discharging men. This appears from what is said in *Malone* v. *Hathaway*, 64 N. York, 10, where in speaking of the statements of the judge in the former case they say that general remarks made in relation to a certain proposition "have been applied to other circumstances and *erroneous deductions made*." The only correct principle to be deduced from that case is, that when a master has delegated to another his *whole authority* in relation to any duty owed to a servant, reserving to himself no power of superintendence or management, then the acts of such agent are the acts of the superior. *Malone* v. *Hathaway*, *Slater* v. *Jewett*, and *Murphy* v. *Boston & Albany R. R. Co.*, before cited. This principle we have no occasion to

question in this case as it has no relation to the facts here. The only other case cited by the judge below is *Shanny* v. *Androscoggin Mills*, 66 Maine, 420. That was a case of an employee *using* a machine after it was set up and ready for operation. The negligence of the defendant was claimed to be that it did not keep the machine in repair, and the effect of that portion of the opinion was, that a person whose duty it was to *use* spinning machines for spinning, after they had been set up, were not fellow-servants with those whose duty it was to keep them in repair. What was said on this point was also unnecessary, for the case was decided against the plaintiff on the ground of her contributory negligence. The case, however, does not apply to the case at bar, for here the question does not arise between the spinner using the machine and those who were to prepare it for his use, but between those who were engaged in the common duty of preparing the machinery for use by the spinners. It seems to us that the case of *Murphy* v. *R. R. Co.*, 88 N. York, 146, before referred to, is exactly in point, and is much nearer to the case at bar than either of the cases cited in the court below. We submit, however, that the better decisions in England and in this country lay down a much more reasonable rule of law than either of these cases, if they mean what the court below claims to be their effect. It is well settled that the duty of a master towards his servant is to exercise reasonable care in providing competent fellow-servants to work with him, and also to provide suitable materials and appliances for him to work with. All will agree on that. The question on which much controversy has arisen is, what are the limits of that ·reasonable care? It will also be agreed that no master is responsible to a servant for negligence of a fellow-servant, but much controversy has also arisen as to who were fellow-servants. The two questions have in most cases been considered together, and so combined as to render it almost impossible to treat them separately; and certain general expressions applied to cases involving one state of things have been applied to cases involving a very different state

of things. The best statement of the whole question is to be found in Wood on Master & Servant, § 411: "Whatever might be said as to the implied duty of a master engaged in a small business, who, at the time when the contract of service was entered into, personally took charge of all departments of the business, it certainly could not be held in the case of corporations, which necessarily act through agents, or of large establishments, that the servant knows or ought to know at the time of his employment are operated through agents, that there is an implied obligation on the master's part to personally supervise and oversee his business; but, on the contrary, the more natural and legitimate inference is that the servant took upon himself all the risks incident to the business, conducted, as he knew or ought to have known, by co-servants, and such is the generally, although not universally, accepted rule of law. There can be no good reason for holding a master liable for injuries resulting from defective machinery manufactured by workmen in his employ who have been selected with reasonable regard to their competency and fitness for the business, when he is not liable if the same machinery is purchased by a competent agent, of a third person by whom it was manufactured. In either case the question is, whether the master is guilty of such negligence in the employment of agents that it can be fairly said he is in fault; whether he has failed to act with such ordinary care and regard for the safety of his employees as a man of ordinary prudence would have exercised under similar circumstances; and if he is not at fault in these respects, there is no rule of law that will hold him liable to his servants for injuries that they may sustain from defects in the instrumentalities of the business, whether they were supplied by third persons or were manufactured by his own workmen." The leading case sustaining this view of the law is *Wilson* v. *Merry*, before cited, where the whole subject is very fully considered. In that case, the owners of a coal pit had employed a sub-manager, and furnished him with suitable workmen and materials to work the pit, and provide

suitable ventilation. He built a scaffold which so obstructed the ventilation of the pit as to cause an explosion of coal damp, which injured a workman employed in cutting out coal; and the House of Lords held that the owners were not liable, on the ground that the employment of a suitable person and furnishing him with suitable materials for having the necessary work done, was the exercise of reasonable care : that such sub-manager was a fellow-servant with the workmen, and his negligence was that of a fellow-servant. This case, and the principles therein laid down, have been substantially followed and approved of in the numerous cases in this country, many of which have already been referred to. To those already cited we would add *Warner* v. *Erie R. R. Co.*, 39 N. York, 468, and *Hough* v. *Railway Co.*, 100 U. S. Reps., 213. There is a class of cases, especially in some of the western states, where it has been held that all the servants of a corporation who are engaged in the purchasing, making and repair of machinery, to be *used* by another set of servants, are not fellow-servants with the latter, but really are the representatives of the master. In some of these cases it seems to be taken for granted that the master is bound, not to exercise reasonable care in furnishing proper appliances, but to see that they are furnished *at all events*, that is to *insure* the servants against injury from improper appliances. The leading case in this class is *Chicago & North Western R. R. Co.* v. *Swett*, 45 Ill., 197 ; and there are similar cases in Missouri, Wisconsin, Iowa, and other western states. These decisions were based upon expressions made by the judges who gave opinions in certain cases in Massachusetts and New York, noticeably *Ford* v. *Fitchburg R. R. Co.*, 110 Mass., 240, and *Flike* v. *Bost. & Alb. R. R. Co.*, 53 N. York, 549. The former case, however, is explained and shown not to be susceptible of this construction, in *Holden* v. *Fitchburg R. R. Co.*, 129 Mass., 268, and the latter is similarly explained in *Slater* v. *Jewett*, 85 N. York, 61. In other cases it is assumed, especially in cases of corporations which must act by agents, that every agent employed in furnishing or

·repairing the appliances of labor, so represents the master that his negligence is the negligence of the master. One reason for these decisions is to be found in the claim sometimes set up in behalf of corporations, that all the directors had to do was to appoint a suitable manager or managers, and then having exercised due care in their appointment, ·the corporation was not liable for any negligence on their part; and in opposing this unreasonable claim these courts have been led too far into the other extreme. The true rule lies, as is usual, between the two extremes. The reasonable view sustained by the authorities is this: The master cannot rid himself of the duty of exercising reasonable care by transferring the whole matter of furnishing proper appliances to another. In that case the negligence of that other is the negligence of the master. As is well said in *Malone* v. *Hathaway*, 64 N. York, 12, "Corporations necessarily acting through agents, those having the superintendence of various departments with delegated authority to employ and discharge laborers and employees, provide materials and machinery for the service of the corporation, and generally direct and control under general powers and instructions from the directors, may well be regarded as the representatives of the corporation, charged with the performance of its duty, exercising the discretion ordinarily exercised by principals, and within the limits of the delegated authority ·the acting principal." So in *Hough* v. *Railway Co.*, 100 U. S. Reps., 218, it is said: "Those at least in the organization of the corporation who are invested with *controlling or superior authority* in that regard represent its legal personality, their negligence from which injury results is the negligence of the corporation." Shearman & Redf. on Neg., § 102; Wharton on Neg., § 229; *Mullan* v. *Phila. Steamship Co.*, 78 Penn. St., 25. The better cases confine the liability of the master for the negligence of agents to those who have "controlling and supreme authority" over special departments of business, who in respect to those departments are the *alter ego* of the master.

The cases that hold that a person occupying the place

that the overseer of repairs did here, is not a representative of the master, but a fellow-servant of the plaintiff, are very numerous.  *Albro* v. *Agawam Canal Co., (supra); Kelley* v. *Norcross,* 121 Mass., 508; *Zeigler* v. *Day,* 123 id., 152; *Smith* v. *Lowell Manf. Co.,* 124 id., 114; *Killea* v. *Faxon,* 125 id., 485; *Lawler* v. *Androscoggin R. R. Co.,* 62 Maine, 463; *Horner* v. *Illinois Central R. R. Co.,* 15 Ill., 550; *Crispin* v. *Babbitt,* 81 N. York, 516; *McCosker* v. *Long Island R. R. Co.,* 84 id., 77.  He was merely one of the many inferior servants of the corporation, not having sole charge of any department of the business which was under his sole control, and in regard to which he represented the corporation, except as any servant who was directed to do any act represented the corporation.  The judge below says:—" He was ordered by the superintendent to make the collars and put them on.  No one else was authorized or empowered for the purpose and he alone was relied upon by the defendants to perform that duty."  The same might be said of any servant who was ordered to perform any duty.  The mere fact that he was the servant directed to do this act did not make him the *alter ego* of the master, or give him the " controlling or superior authority," which the cases require to make his negligence the negligence of the company itself.  Such a rule, instead of requiring reasonable care from the corporation that proper appliances were furnished, would make it *guarantee* that proper appliances were furnished, which we have shown is not the law.  So as to the further deduction of the judge, that the plaintiff and the overseer of repairs were not fellow-servants; where he makes a distinction between those servants who " provide and *put up* the machinery, shafting or implements, and the servant who afterwards *runs* them for the purpose for which they are provided and put up."  The better cases, we think, say no such distinction exists.  But if it does, the case of *Murphy* v. *Bost. & Alb. R. R. Co.,* before cited, shows that that principle is not applicable to this case.  The person who set up the shafting, the person who set up the frame, and the person who connected them together so

that the spinners could use the machinery, were all three engaged on the common business of preparing the machinery for use by others. It could all have been done by one person, or different persons could do different parts of the necessary labor. They had a common object, the preparing the machinery for operation, for the purpose of being used by the spinners to make thread. It would be an unreasonable refinement to say that the workman who put up the main shaft, the one who put up the countershaft, the one who put on the pulleys, the one who set up the spinning frames, and the one who put on the belts, were all in charge of separate departments of labor under the corporation, and therefore were not fellow-servants, merely because they each did a different one of the various operations necessary to prepare the spinning frame for use.

*J. L. Hunter* and *E. B. Sumner*, for the appellee

PARK, C. J. (After stating the facts.) Upon these facts the question is, do they establish negligence in the defendants, which caused the injury to the plaintiff? If the injury was produced by the combined negligence of both parties the plaintiff cannot recover. He is bound to show that the injury was caused by the negligence of the defendants, which he cannot do if his own negligence contributed to its production. Hence, where a question is made with regard to such contributory negligence of a plaintiff, it is convenient to consider separately the facts with regard to the negligence of each party.

Were the defendants guilty of negligence? The controling facts of the case upon this point are, that the countershaft was constructed and left in an unfit and dangerous condition for use ; that it was put up in the defendants' mill, together with other shafting, in order to enlarge the manufacturing capacity of their works, and was run for the first time on the day when the accident occurred; that the superintendent had charge of the construction and use of all the machinery of the mills, both new and old; that he

superintended the construction of the shaft in question, and had knowledge of its dangerous condition; that he contented himself with giving orders to the overseer of repairs to put collars upon the shaft and make it safe; that after machines were made ready for the workmen in the new department, he gave directions to the overseer of the room to make the shaft ready for communicating power to the new machines and run the same; and that as soon as power was applied the shaft fell and the plaintiff was injured. These are the principal facts in this part of the case, and upon them rests the question of the defendants' negligence.

The plaintiff entered the defendants' service as an employee in their manufacturing establishment; and we are first to consider what duties they assumed regarding him as their servant, and what risks he assumed in the service. The books are full of cases on the subject, but, although they are numerous, they generally agree that the employer is bound to exercise reasonable and proper care to furnish the employee with reasonably safe machinery and tools, and is responsible for neglect in this particular which causes injury to the latter. All ordinary risks incident to the service, including those resulting from the carelessness of fellow-servants, are assumed by the employee, and for these the employer is not responsible.

In *Ford* v. *Fitchburg R. R. Co.*, 110 Mass., 240, the court say:—"The rule of law which exempts the master from responsibility to the servant for injuries received from the ordinary risks of his employment, including the negligence of his fellow-servants, does not excuse the exercise of ordinary care in supplying and maintaining proper instrumentalities for the performance of the work required. One who enters the employment of another has a right to count on this duty, and is not required to assume the risks of the master's negligence in this respect. The fact that it is a duty which must always be discharged, where the employer is a corporation, by officers and agents, does not relieve the corporation from this obligation. The agents who are charged with the duty of supplying safe machinery are not,

in the true sense of the rule relied on, to be regarded as fellow-servants of those who are engaged in operating it. They are charged with the master's duty to his servant. They are employed in distinct and independent departments of service, and there is no difficulty in distinguishing them, even when the same person renders service by turns in each, as the convenience of the employer may require."

This was said in a case where an engineer sought to recover damages for an injury he received from the explosion of his engine which was out of repair, and the defence was that the want of repair was owing to the negligence of fellow-servants in the department of repairs.

Wharton, in his work on Negligence, § 211, says:—"The question is that of duty; and without making the unnecessary and inadequate assumption of implied warranty, it is sufficient for the purposes of justice to assert that it is the duty of an employer inviting employees to use his structures and machinery, to use proper care and diligence to make such structures and machinery fit for use." In § 212 he says:—"At the same time we must remember that where a master personally, or through his representatives, exercises due care in the purchase or construction of buildings and machinery and in their repair, he cannot be made liable for injuries which arise from casualties against which such care would not protect. It is otherwise if there be a lack in such care, either by himself or his representatives. The duty of repairing is his own, and, as we shall hereafter see, the better opinion is that he is directly liable for the negligence of agents when acting in this respect in his behalf. If the master knows, or in the exercise of due care might have known, that his structures or engines were insufficient, either at the time of procuring them, or at any subsequent time, he fails in his duty." In § 282 he says:— " It is important to remember that the master is liable when the negligence of the offending servant was as to a duty assumed by the master as to working place and machinery. A master, as we have already seen, is bound, when employing a servant, to provide for the servant a safe

working place and machinery. It may be that the persons by whom buildings and machinery are constructed are servants of the common master, but this does not relieve him of his obligation to make buildings and machinery adequate for working use. Were it otherwise, the duty before us, one of the most important of those owed by capital to labor, could be avoided by the capitalist employing only his own servants in the construction of his buildings and machinery. In point of fact this is the case in most great industrial agencies; but in no case has this been held to relieve the master from the duty of furnishing to his employees material, machinery and structures adequately safe for their work. He does not guarantee that either building, machinery, or organization shall be perfect; but he is bound by the rule *sic utere tuo ut alienum non lædas*, to use such diligence and care in this relation as is usual with good business men in his line. It is not enough for him to employ competent workmen to construct his apparatus. If an expert, he must inspect the work; and if not, he must employ another competent person as expert for the purpose. If such, however, is his duty, he must not only see that the structure he provides is suitable at the outset, but that it is kept in repair, and the repairer's negligence in this respect is the master's negligence." Pierce, in his work on Railroads, § 370, says:—" The company, like any master, is under an obligation to its servants to use reasonable care to provide and maintain a safe road-bed, and suitable machinery, engines, cars, and other appointments of the railroad, and is liable to them for injuries resulting from defects which it knew of, or ought to have known of, and could have prevented by the exercise of such care; and it is under the same duty and liability to maintain these instrumentalities in proper condition. The servant assumes the natural risks of his employment, but not those which the wrongful act of the company has added."

In *Bartonshill* v. *Reid*, 3 Macq. H. L. Cases, 266, Lord CRANWORTH said "that where a master employs his servant in a work of danger he is bound to exercise due

care in order to have his tackle and machinery in a safe and proper condition, so as to protect the servant against unnecessary risks." In *Railroad Co.* v. *Fort*, 17 Wall., 553, the court, in commenting on the risks which servants are presumed to have assumed by the contract of service, said: —" But this presumption cannot arise where the risk is not within the contract of service, and the servant had no reason to believe he would have to encounter it. If it were otherwise principals would be released from all obligations to make reparation to an employee in a subordinate position for any injury caused by the wrongful conduct of the persons placed over him, whether they were fellow-servants in the same common service or not. Such a doctrine would be subversive of all just ideas of the obligations arising out of the contract of service, and withdraw all protection from the subordinate employees of railroad corporations. These corporations, instead of being required to conduct their business so as not to endanger life, would, so far as this class of persons is concerned, be relieved of all pecuniary responsibility in case they failed to do it. A doctrine that leads to such results is unsupported by reason, and cannot receive our sanction." In *Hough* v. *Railway Co.*, 100 U. S. Reps., 213, the court said :—" A railroad corporation may be controlled by competent, watchful and prudent directors, who exercise the greatest caution in the selection of a superintendent or general manager, under whose supervision and orders its affairs and business, in all of its departments, are conducted. The latter, in turn, may observe the same caution in the appointment of subordinates at the head of the several branches or departments of the company's service. But the obligation still remains to provide and maintain in suitable condition the machinery and apparatus to be used by its employees—an obligation the more important, and the degree of diligence in its performance the greater, in proportion to the dangers which may be encountered. Those, at least, in the organization of the corporation, who are invested with controlling or superior authority in that regard, represent its legal personality; their negligence, from which

injury results, is the negligence of the corporation. . The latter cannot, in respect of such matters, interpose between it and the servant who has been injured without fault on his part, the personal responsibility of an agent, who in exercising the master's authority has violated the duty he owes, as well to the servant as to the corporation. To guard against misapplication of these principles we should say that the corporation is not to be held as guaranteeing or warranting the absolute safety, under all circumstances, or the perfection in all of its parts, of the machinery or apparatus which may be provided for the use of employees. Its duty in that respect to its employees is discharged when, but only when, its agents, whose business it is to supply such instrumentalities, exercise due care as well in their purchase originally as in keeping and maintaining them in such condition as to be reasonably and adequately safe for use by employees."

This was said in a case where the plaintiff's decedent, an engineer upon the defendants' railroad, was killed while in the performance of his duty in the defendants' employment, by reason of the defective condition of his engine; which defective condition was owing to the negligence of their master-mechanic and of the foreman in their repair department, who were competent and proper persons for their positions. The defence in the case was, in part, the same as it is here, namely, that due and proper care had been exercised in the purchase of the engine and in the selection of the officers charged with the duty of keeping it in proper repair.

The case of *Davis* v. *Vermont Central R. R. Co.*, 55 Verm., (not yet out, this case appearing in a magazine,) is a very recent and important one upon this subject. The marginal note is as follows:—"In an action on behalf of a fireman of a railroad company, killed by the washing out of a culvert, the negligence of the company's bridge-builder in constructing, and of the road-master in repairing the culvert, is attributable to the company." It was conceded in the case that the bridge-builder and road-master were ordinarily

skillful and careful men in their several employments, and that the defendants were guilty of no negligence in selecting and employing them. It further appeared that the bridge-builder was intrusted by the defendants with the construction and maintenance of all the bridges and culverts in that division of the road, and that the road-master was likewise intrusted with the construction and maintenance of the track and road-bed of the road. The road-master had under him section-foremen who had charge of section-workmen. These were the important facts of the case. The defendants contended that the bridge-builder, road-master and section-foreman were fellow-servants of the decedent in the running of their trains, and consequently that their negligence was not in law attributable to them, but was one of the risks which the decedent assumed when he entered their service. The court, in deciding the case, use the following language:—"The general principles underlying the determination of the duties and liabilities of the master and the risks which the servant assumes by entering upon the employment, are very generally agreed upon. Where the employment is hazardous it is very generally agreed that the master assumes the duty of exercising reasonable care and prudence to provide the servant a reasonably safe place and reasonably safe machinery and tools to exercise the employment, and to maintain the place, machinery and tools in a reasonably safe condition during the time of such employment. He also assumes the duty of exercising the same measure of care and prudence to provide suitable materials and suitable and sufficient co-servants to properly exercise the employment or carry on the business. When this duty is discharged by the master the servant assumes all risks and hazards attendant upon the exercise of the employment or performance of the work, including those resulting from the negligence and carelessness of co-servants. The diversity in the decisions has arisen in determining who are co-servants in the common employment, and whether the master is to be charged with the negligence of an employee, who in some parts of the employment is strictly a co-servant

with the person injured, and in other parts is discharging a duty incumbent upon the master." And the court, in criticising the doctrine of the Lord Chancellor in *Wilson* v. *Merry*, Law Reps., 1 House of Lords Cases, Scotch App., 326, and of other cases which hold that if the master attends in person to the management of his affairs he is responsible for his negligence which causes injury to his servant, but if he commits such management to an agent who is competent and proper for the position he is not responsible for the agent's negligence which causes a like injury, use the following language :—" The question is naturally suggested, why should he [the master] not also be liable for the negligence of the agent or servant whom he has appointed to discharge the same duty in his stead, although he has exercised due care to select a person competent and skillful ? Is such an agent or servant, while performing the duty cast by the relation upon the master, a fellow-workman with the master's servant in such a sense that the latter cannot and ought not to recover of the master for injuries sustained through the negligence of the former? If so the master, who performs his part of the duty, .as this defendant and all corporations must, by agents and servants, secures an immunity from liability which the master who personally enters the service to manage and direct the performance of the work, does not enjoy. The doctrine now established by the United States Supreme Court, and by most of the courts of last resort in the several states, holds the master liable to his workman for injuries sustained from the negligent performance of duties which rest by the relation upon the master, whether the master performs such duties personally or through an agent or servant." In conclusion the court say :—" When the case of *Hard* v. *Vermont & Canada R. R. Co.*, 32 Verm., 473, was decided, the liability of the master was held to be dependent upon whether the servant whose negligence caused the injury and the servant injured were fellow-servants in a common employment and work. Making this the test for determining the master's liability, the reasonings and con-

clusions of the late Chief Justice are unanswerable. But this test, while determinative in a great number of cases, has been abandoned both in England and in this country, and in lieu thereof the master's liability has been made to rest upon whether the negligence arose in the performance of a duty for the careful discharge of which he became responsible when he assumed the relation of master to the injured servant. On these principles, which we think furnish the true ground upon which the master's liability rests, and on the American application of them, the bridge-builder and road-master, while inspecting and caring for the defectively constructed culvert, were performing a duty which, as between the intestate and the defendants, it was the duty of the defendants to perform. Their negligence therein was the negligence of the defendants, being the agents of the defendants for the performance of those duties. Notice to them in regard to the defective construction of the stockade as affecting the safety of the culvert, was notice thereof to the defendants."

On the same principle the superintendent and master-mechanic and the overseer of repairs in the defendants' establishment were performing the duty which the relation of master and servant cast upon the defendants, when they superintended the construction and undertook to attend to the condition of the countershaft in question. Their act was the act of the defendants, their knowledge of its unsafe condition was the defendants' knowledge, and their negligence in the premises was also the negligence of the defendants.

Suppose that the superintendent and master-mechanic had been the owner of the defendants' establishment, and was running the works when the injury occurred. Could there be a doubt regarding his liability to the plaintiff, so far as the question we are now considering is concerned? All the cases hold that he would have been bound to exercise reasonable care to provide safe appliances for the plaintiff's use. Such appliances were not provided. The superintendent knew that the countershaft was not fully constructed, and

that it was left in an unsafe and dangerous condition to be used. What care did he take to make its condition safe before he ordered it to be run? He simply directed the overseer of repairs to complete the unfinished appliance, but took no measures to ascertain whether it was finished or not before the plaintiff was injured. All the authorities cited, and indeed all the cases, hold that it is not enough for the master to order safe machinery to be constructed, but he must exercise reasonable care to see that the machinery is in fact safe after the order has been executed. It would be an easy matter for a master to escape liability if an order to construct safe machinery would be sufficient. That would be equivalent to exculpating him entirely from all liability in this regard. It is clear there would have been no escape for the superintendent and master-mechanic, so far as his negligence was concerned, had he been the master here. How then can there be any escape for the defendants on this ground? The superintendent and master mechanic was performing the duty of the defendants when he superintended the construction of the appliance in question, for he had the special charge of this department of the defendants' business. The case is barren of all information tending to show that any officer of the corporation above the superintendent cared for the proper construction and safe condition of this appliance, and if the superintendent did not represent the defendants in this regard then they had no representative, and they were equally culpable for the want of one, for an unsafe and dangerous appliance was in fact furnished for the plaintiff's use, and they were bound to know what was being done in their immediate presence in this respect. The appliance was constructed to enlarge the capacity of the defendants' works, and so far as the enlargement and every thing pertaining to the case are concerned, all were new, and stand exactly as the defendants' works originally stood when they first began to be operated. We think it is clear that there is no escape for the defendants so far as the question of their negligence is concerned.

VOL. L.—30

But it is said that the plaintiff, in belting the countershaft to the spinning frame, was engaged in the same common employment with those who constructed the shaft itself; that they all were preparing the spinning frames for use, and consequently were co-laborers or fellow-servants together; that the overseer of repairs was one of them, and for his negligence in omitting to put collars upon the shaft the defendants are not responsible, for it was the negligence of a fellow-servant, the risk of which the plaintiff assumed by the contract of service. And they cite the case of *Murphy* v. *Boston & Albany R. R. Co.*, 88 N. York, 146, in support of the claim. If it be conceded that the overseer of repairs was a fellow-servant of the plaintiff in the work he was doing, still the claim does not exonerate the defendants from the effect of the negligence they committed through their superintendent and master-mechanic, for the law is so that the master is responsible for an injury produced by the combined negligence of himself and a fellow-servant of the injured employee. 2 Thompson on Negligence, 981; Wharton on Negligence, § 227; *Paulmier* v. *Erie R. R. Co.*, 34 N. Jer. Law, 157; *Cayzer* v. *Taylor*, 10 Gray, 274; *Booth* v. *Boston & Albany R. R. Co.*, 73 N. York, 38; *Perry* v. *Ricketts*, 5 Ill., 234.

But the case of *Murphy* v. *Boston & Albany R. R. Co.*, (supra,) was a very different one from the case at bar. There the court held that the employees who repaired the boiler of the steam engine that exploded and injured the plaintiff were fellow-servants with the employee who set the safety valve to the boiler, for the engine was no more a complete machine without the safety valve than it would have been without the boiler. These essentials were simply different parts of the same engine. Here the belt formed no part of the countershaft. It merely communicated the power of the shaft to the spinning frames, and was as much a part of the frames as it was of the shaft. If this connection was a part of the shaft, then all the connections of the shaft back to the engine or water wheel, as the case may be, were parts of it, and the whole establishment was one vast

machine. The defendants admit that the spinners would have had a cause of action against the defendants had they been injured by the falling of the countershaft, and still they put on and off the belt making the connection between the countershaft and spinning frames many times a day, in doing their work as spinners. The belt is turned on to a loose pulley when it is turned off the frame, but the pulley is a mere convenience for putting the belt on again. The act itself is precisely the same as was that of the plaintiff when he was injured. The case of *Murphy* v. *Boston & Albany R. R. Co.*, which the defendants rely upon in this part of the case, holds, that if the engine had gone out upon the road, and its fireman or engineer had been killed by its explosion while in use, there would have been a cause of action against the company. But it might have been said with equal propriety in that case, as it can be said here, that the fireman in supplying fire and water to the engine was merely preparing it for use, as much as the boiler-maker in repairing the boiler; and that the work of both was essential before the engine would be ready for use. Fire and water in that case performed a similar office with that of the belt here. The engine was a complete machine in and of itself, but it required fire and water to make it useful. The countershaft was a complete appliance in and of itself, but it was useless without a belt. There is nothing in this claim.

Was the plaintiff guilty of negligence which contributed substantially to produce the injury of which he complains?

It is said by the plaintiff that the court below has not found that he was negligent in not making an examination of the shaft before applying the belt to it; but on the contrary has found that he was not in fact negligent. The defendants contend that negligence is a compound question of law and fact; that the court having found all the facts, it is for the law to say whether he was guilty of negligence or not. Without stopping to consider whether or not this is so, in a case of this character, we think it is clear that an important fact is wanting to constitute negligence,

so as to relieve the defendants from responsibility upon this ground. It is not enough for a plaintiff to be negligent. He is not necessarily deprived of the right to recover simply because he has been so; but the additional fact must appear that the negligence contributed substantially to produce the injury for which he sues. Here the claimed negligence consists in not making an examination of the shaft before putting the belting on it. Had the plaintiff made the examination what probability was there that he, a non-expert, taken that day from the street, would have discovered that the countershaft was without collars and needed them, when there were two other modes used in the mill for hanging shafts which rendered collars unnecessary, and in relation to one of them the court finds that the fact whether the shaft needed collars or not could be ascertained " only upon a careful inspection." The overseer of repairs, an expert, who knew that the shaft needed collars, made an examination of it just before it was belted, and failed to discover that it was without them. The superintendent of the mill, who was also the master-mechanic of all the defendants' works, had paid daily visits to the room in his professional capacity for a considerable period of time, and though he likewise knew how the shaft was hung, and that it was constructed without collars, he failed to discover that it was then without them. Had the plaintiff made an examination he was only bound to look for obvious, manifest defects. Wood (Master & Servant, 749,) says: "The servant is not required to inspect the appliances of the business, to see whether or not there are latent defects that render them more than ordinarily hazardous, but only to see whether there are defects or hazards that are obvious to the senses. If the servant, from any source, has the same information that the master has, he is bound to act upon it; but the general statement made in some of the cases, that if the servant has the same means of information that the master has, the latter is excused from liability, must be taken in a qualified sense, and only applies to information in fact possessed by the servant or that which is

patent and obvious.  *  *  If, as is said in some of the cases, a servant cannot recover if he has the same means of information that the master has, he would be bound to look for defects, to inspect the appliances of the business, and would thus be burdened with the duties that legally and properly devolve upon the master, and could seldom recover for injuries resulting from the use of defective machinery."

Such being the case, the finding of the court that the defect in question could not have been discovered by the plaintiff without "a careful inspection," is equivalent to finding that, if the plaintiff had made an examination, he would not have discovered the defect.   Consequently if he was guilty of negligence in the premises, the negligence did not contribute to the production of the injury for which he complains.

But was he guilty of negligence?   The claim of the defendants that he was, is based upon the following finding of the court: "It was proved to be the understanding among mill-owners and those having charge of mills and of their several departments, that it is the duty, not only of overseers and second-hands, but also of every person who is employed and directed to connect shafting with machinery, to see that every thing is in proper condition before attempting to make the connection, and if they fail to do so they are guilty of negligence."

What have we here tending to show that it was the duty of the plaintiff to make the examination?   Can a private understanding among mill-owners and those having charge of mills, not communicated to their employees, create the duty?   No such understanding had ever been communicated to the overseer of the room even, although he had been many years in the defendants' employ; much less to the plaintiff, who had just come from the street to go into the defendants' employment.   It would seem that such understanding, even among mill-owners, must have been confined to machinery in use, requiring their employees to look out for defects caused by ordinary wear and tear, and not to new machinery just from the hand of the mill-owner.

In relation to such machinery it would seem that their understanding must have permitted employees to rely upon the duty of mill-owners to exercise reasonable care and to furnish safe machinery in the first instance.

There is no error in the judgment appealed from and it is therefore affirmed.

In this opinion the other judges concurred.