JERRY DARRIGAN *vs.* THE NEW YORK & NEW ENGLAND
RAILROAD COMPANY.

52 285
63 419
52 285
68 354
52 285
70 195
52 285
74 345
74 846
74 482
52 285
77 101

Two irregular trains were running in opposite directions on the railroad of
the defendants. All the trains were run as directed by telegrams from
a train-dispatcher in the superintendent's office. Through his negli-
gence in giving directions the two trains collided, and the plaintiff, an
engineer on one of them, was seriously injured. Held that the train-
dispatcher was not the fellow-servant of the plaintiff, and that the
defendants were liable to the latter for the injury.

A printed rule of the company, under the head of "movement of trains
by special orders," provided that all orders should be given by a super-
intendent, or by a dispatcher appointed for that purpose, under direc-
tion of a superintendent; and another that division superintendents
were supreme in their respective divisions, and were responsible only
to the management for such orders as they might give. Held that,
the whole power of the company as to the movement of these trains
being delegated to the train-dispatcher, he was to be regarded as rep-
resenting the company.

Among the printed rules of the company, placed in the plaintiff's hands,
was this:—"The regular compensation of employees covers all risk or
liability to accident." Whether public policy will permit a railroad
company to make such a contract with its employees:—*Quære.*

The plaintiff offered a surgeon as an expert. The witness had examined
the plaintiff's injury and, in stating the result, he testified, against the
defendants' objection, to actions and words of the plaintiff, while
being examined, indicating pain. Held that the evidence was inad-
missible.

But the defendants afterwards called a surgeon who had examined the
plaintiff, and his testimony as to the character and extent of his in-
juries agreed essentially with that of the plaintiff's surgeon. Held
that the error in admitting the former testimony had become imma-
terial as not injuriously affecting the defendants.

[Argued November 19th, 1884—decided February 9th, 1885.]

ACTION to recover for an injury caused by the negligence
of the defendants, a railroad company ; brought to the Su-
perior Court in Hartford County. The defendants suffered
a default and were heard in damages before *Stoddard, J.*
The following facts were found by the court.

The defendant is a railroad corporation, operating a line
of single tracked road from Boston, Massachusetts, through
the state of Connecticut to the Hudson river. In the trans-

action of its business its line, at the time of the injury com-
plained of, was divided into two divisions; the western
division extended from Hartford to the Hudson river. In
the organization of the corporation the general superinten-
dence and control of its affairs was vested in a board of
directors. The active management, superintendence, con-
trol and operation of the railroad was confided to a presi-
dent, a subordinate to the president, and next in rank a
general manager; then the division superintendents, who
were responsible to and acted under orders from the general
manager. The division superintendents employed and
removed all train and yard-men, and other employees on
their several divisions, including train-dispatchers and other
telegraph operators.

The railroad was run and the movements of trains di-
rected and controlled by telegraph. Upon the western
division three train-dispatchers were employed, who were
stationed at Hartford, and occupied the office of the division
superintendent. One of the three was known as the chief
train-dispatcher. He had no other duties or powers than
the other two. Each one of the train-dispatchers was on
duty for the term of eight hours in each day; and while on
duty the powers and duties of all of the train-dispatchers
were the same. The management of trains required on each
train an engineer, fireman, conductor, and brakemen; and
to transmit orders from the train-dispatchers to the train
men required telegraph operators stationed along the line
of the road. Trains were made up by yard-men. Regular
trains were run in accordance with a printed time schedule.
Trains not running upon such schedule were special or
irregular, and were run wholly by telegraphic orders. The
engineers were furnished with a printed copy of the rules
adopted by the company, in force at the time, and govern-
ing the running of trains.

Among the rules governing "the movement of trains by
special orders," rule seventy-seven is as follows:— "*By
whom orders shall be given.* All orders shall be given by a
superintendent or by a dispatcher appointed for that pur-

Darrigan v. N. York & N. England R. R. Co.

pose under direction of a superintendent; no other person will be allowed to give them. Only one dispatcher will be allowed to move trains on the same division at the same time." Another of the rules is as follows:—" The head of each department is supreme authority in that department, and all orders must be issued through him, but in emergencies each employee must promptly obey the orders of any superior officer, making report thereof to the head of his department as soon as practicable." Another was as follows:—" Division superintendents are supreme on their respective divisions, and are responsible only to the management for such orders as they may give; they will take care, however, not to give orders interfering with the general administration of any of the departments, nor in violation of the rules herein contained."

When a special train was made up and ready to start the yard-master reported that fact to the division superintendent or to the train-dispatcher on duty. Generally, but not invariably, the yard-master so reported to the superintendent or chief train-dispatcher. But in case the chief train-dispatcher was not on duty, and the superintendent was not present, the yard-master reported to the train-dispatcher on duty, and such train-dispatcher ordered out an engine, and controlled and directed the movements of the train by telegraphic orders. The business of the road was considerable, and varied from day to day, so that special trains were a necessity; it was not possible to know more than from six to twelve hours in advance how much freight would be received from connecting roads, as it was received without notice preceding its arrival.

On December 14th, 1882, the plaintiff was a locomotive engineer employed by the defendant. On this day, while acting in this employment, he was injured by reason of a collision between the special train upon which he was then acting as such engineer, and a construction train running under orders hereinafter stated. The collision occurred near Union City, Connecticut, on the western division of the defendant's road. When the collision was imminent

and unavoidable and his life in danger, the plaintiff jumped from his engine and was severely injured. He did not contribute by any negligence on his part to the injury, but in all respects acted as any prudent man would have done under like circumstances. The immediate cause of such collision was the conflicting orders given by the two train-dispatchers set forth below.

On said December 14th, 1882, at 12.04 P. M., J. W. Hyndman, chief train-dispatcher of the defendant at Hartford, being then and there on duty, telegraphed to the conductor and engineer of the construction train which afterwards collided with Darrigan's train, an order which was recorded as follows on the official order-book, the signatures of the conductors and engineers being also on that book:—

"33 Hold No. 6 for orders, 33.
C. & E. No. 6, Eng. 125.    } O. M.
Monahan & Engr., Eng. 80. } S. F.

" 12.04 P. M.

" Monahan and engineer, engine 80, will run to Towantic as a special train ahead of No. 6, engine 125, and can then work between Towantic and Waterbury as a special train until 6 P. M., and will protect themselves with flags against Goble special east, engine 106, after 1.30 this P. M.

" Monahan, Richardson,              12 E. H.
" Boughton, Allen,       12.40 P. M.        J. W. H."

Shortly after this order was given Hyndman was relieved by J. C. Stuart, one of the train-dispatchers, who then went on duty. The above order, with the exceptions of the signatures of Richardson and Allen, and the time 12-40 P. M., then stood as the last order but one on the official order book. It was Stuart's duty to acquaint himself with all existing orders, and his attention was called to this order by Hyndman. The order books indicated that the order had not run out by the fact that it was not canceled by the letter H. Stuart afterward received by telegraph from Southford, and entered on the order books the signatures of

Richardson and Allen, conductor and engineer of a train affected by the order.

Later in the afternoon Stuart, while on duty, negligently sent the following order to the local operator at Waterbury. This order was also entered on the official order books.

"No. 52.

   Davenport and Engr. Eng. 110 Bx.

4.54  Run to Brewsters as a special, No. 2,

P. M.  of Dec. 14th is discontinued.

   Davenport, Darrigan, 4.55 P. M.

         12 E. H.,  J. C. S."

This order compelled Darrigan's train to run over the tracks occupied by the construction train, and conflicted with the first mentioned order. The last mentioned order was obeyed, and Darrigan's train while moving according to it came into collision with an engine and tender of the construction train while moving under the first mentioned order.

Elliott Holbrook was division superintendent, and the initials "E. H." were to indicate that the orders were sent in accordance with the rule before mentioned, and to put the stamp of authenticity upon them, and to secure uniformity in issuing them, and to indicate that the orders were sent by authority of the superintendent.

The train-dispatchers had nothing to do with the employment or removal of the engineers, nor any further control than as is herein indicated.

Reasonable care had been exercised in the selection of Stuart as a train-dispatcher, and with this exception he had been a careful and competent dispatcher. He was immediately and permanently removed by Holbrook. There was no negligence on the part of Hyndman, the chief train-dispatcher.

The rules and regulations of the defendant company governing the movements of trains were in themselves proper and sufficient rules, and if complied with no collision could take place.

There was at the time of the accident no order or rule requiring the construction train to protect itself by flags against all special trains. A short time prior thereto such construction train had worked under such orders.

There was no rule requiring the train-dispatchers to use a train sheet to indicate the position of all trains to the eye, although such a train sheet was sometimes used by the dispatchers; no train sheet was used by Stuart at the time in question.

There was no negligence on the part of any of the train men on either of the colliding trains which contributed to the accident.

Among the rules of the company which had been placed in the hands of Darrigan, one is as follows :—" The regular compensation of employees covers all risk or liability to accident."

At the time of the accident the speed of Darrigan's train was about eighteen miles an hour; he was running a " consolidation engine."

So far as the printed rules .and regulations of the company did not govern, the train-dispatcher was authorized to give such orders for the movement and protection of trains as he saw fit, and while so acting he had all the authority of, and acted in the stead and place of, the division superintendent. The train-dispatcher had no power greater than the superintendent.

The two orders set forth in full above were duly received by and acted upon by the train men to whom they were sent.

There was no rule of the company requiring a regular train preceding a special to give notice by carrying a flag, indicating that a special train was following. A regular train was due and arrived at Waterbury from the west, shortly before the plaintiff's train left. This train preceded the construction only a short time.

Upon the above facts the defendant claimed that there was no liability on its part, and claimed that Darrigan acting as such engineer, and Stuart in sending the order, were

in a common employment, so that the company was not responsible to Darrigan for such negligence of Stuart. But the court ruled that the company was liable upon the facts herein set forth, and that Stuart in sending the order was acting in the place and stead of the division superintendent, and was performing an act which it was the duty of the corporation to do without negligence.

The plaintiff offered the testimony of several physicians, some of whom had been employed by the defendant, who had examined and treated the plaintiff, who testified to his exclamations indicating present pain while his injuries were undergoing examination. When he had nearly made up his mind that the defendant would not make any substantial recompense for his injuries, and, if his injuries were of a permanent and disabling character, to sue the company, he called upon a surgeon in Hartford for treatment, and to ascertain whether his injuries were permanent. This surgeon examined him, and was called as a witness, and testified to the nature, extent, and character of his injuries. The surgeon, after making such examination of Darrigan, requested him to visit another surgeon and get his opinion, and he did so. The last-mentioned surgeon made an examination of Darrigan's injuries and was asked to state the result of that examination. In so doing, against the objection of the defendant, he testified to actions and words of Darrigan while so being examined, indicating pain and suffering. The defendant objected on the ground that the witness was not consulted by Darrigan for treatment, but for the purpose of being at some time used as a witness. The testimony was taken subject to that objection until counsel could produce the case of *Grand Rapids & Indiana R. R. Co.* v. *Huntley*, 38 Mich., 537, and afterwards the matter was held for consideration by the court by consent of counsel. Afterwards the defense called a surgeon who had examined Darrigan, and there was no material difference in the testimony of the witnesses for the plaintiff and defendant as to the extent and character of the injury, and so the court did not find it necessary to make any rul-

ing as to the admissibility of this testimony. But the court was of opinion, and at the request of the defendant states, that such evidence was not rendered inadmissible because the statements were made to a physician for the purpose of qualifying him to testify intelligently, and not for the purpose of treatment; that the true office of such fact was to affect the weight of testimony and not its admissibility. The defense was not understood to waive the objection to such evidence.

The place of the collision was about four miles from Waterbury, and on a curve; there was then no telegraph station between Waterbury and Southford, a distance of about eleven miles.

Owing to the large amount of train dispatching it was not practicable for the superintendent to perform that duty personally, and Holbrook has never, on the western division, performed it personally.

Upon the cross-examination of Holbrook, who had testified on the direct for the defense as an expert that the rules of the company were suitable and proper and that no improvement could be made, against the objection of the defendant, the court allowed him to be asked if that construction train had not been run up to a time immediately preceding the day of the accident under rules requiring it to protect itself against all trains by flags; and another witness was asked, against the objection of the defendant, whether such a rule had not previously been worked under on the road. This testimony was admitted in contradiction of the testimony of the defendant, to qualify the statements of the experts for the defendant, and as indicating the possibility that such rules which existed at the time of the accident were not suitable and proper rules.

The construction train on the day in question was not working near a station, and at the time of the accident was on its way to Waterbury.

The court assessed the damages at two thousand dollars. The defendants appealed to this court.

*S. E. Baldwin* and *E. D. Robbins*, for the appellants.

1. Stuart and Darrigan were fellow-servants. Both were engaged in the common business of moving a train. All trains were moved by telegraphic orders, sent by a subordinate employee. The organization of the defendant corporation was as follows:—1st. The general superintendence and control of its affairs was vested in a board of directors. 2d. The active management, superintendence, control, and operation of the road was confided to a president. 3d. Subordinate to the president, and next in rank, was the general manager. 4th. Then the division superintendents, who were responsible to and acted under orders from the general manager. The division superintendent employed and removed all train and yard-men and other employees on their several divisions, including dispatchers and other operators. Superintendent Holbrook employed Stuart just as he employed Darrigan, and he employed both to co-operate in running trains. It is found that "owing to the large amount of train-dispatching, it was not practicable for the superintendent to perform that duty personally, and Holbrook has never, on the western division, performed it personally." His initials were signed to each dispatch by the train-dispatcher, as is found, "to indicate that the orders were sent in accordance with the rule, to put the stamp of authority upon them, to secure uniformity in issuing them, and to indicate that they were sent by authority of the superintendent." Also that, "so far as the printed rules and regulations of the company did not govern, the train-dispatcher was authorized to give such orders for the movement and protection of trains as he saw fit, and while so acting he had all the authority of, and acted in the stead and place of, the division superintendent." In the present instance the rules of the company did govern and expressly provided that "orders shall be sent to all trains affected by them at one and the same time," and that "due notice, as far as possible, shall be given by dispatchers to telegraph operators, conductors and engineers of all trains running in either direction, that

a special train is on the road, and its destination." Also that " the above rules in regard to the movements of trains by special orders are for the direct information and safety of all parties interested; no excuse will be received from dispatchers, telegraph operators, conductors or engineers for the violation of them." Stuart, therefore, under these rules, was not authorized to give the order in question to Darrigan, while that to the construction train remained in force, nor to send any such order to Darrigan without sending a duplicate to the other train at one and the same time; and was not acting in the place of the division superintendent when he violated his duty. The common tests and conditions of co-employment between Stuart and Darrigan are disclosed by the finding: a common service and object —the movement of the same train; a common superior who hires and discharges both at his pleasure; a common set of rules and regulations to govern each. Stuart and Darrigan were both parts of the machinery provided for by these rules. Each had these rules in his hands and knew the duty of the other therein prescribed. They were in daily communication from hour to hour, and either one was in a position to discover, and, if he chose, report to their common superior any lack on the part of the other of that attention and careful obedience to the rules which the safety of the general public required. *Dana* v. *N. York Central R. R. Co.*, 23 Hun, 473. The common tests and conditions of the relation of superior agent and inferior employee are wanting. Stuart did not hire and could not discharge Darrigan. He was, in this instance, performing a duty of hourly detail, under the government of elaborate specific rules, carefully framed, so that " if they were complied with no collision could take place." He sent Darrigan orders by telegraph, precisely as the train conductor sent him orders by pulling the signal rope which connects the cars with the engine. The negligence or disobedience in such an act of a careful servant could no more be guarded against than the instantly fatal negligence or disobedience of conductor, flagman, switchman, or any other fellow-

servant. Stuart was doing no act which only the head of the corporation could properly perform. On the contrary, it was impracticable even for the division superintendent to take any part in directing or sending train-dispatches, and above the division superintendent, by successive gradations, were the general manager, the president, and the directors. Pierce on Railroads, 361, 366; *Wilson* v. *Willimantic Linen Co.*, 50 Conn., 433, 439, 457; *Robertson* v. *Terre Haute & Indianapolis R. R. Co.*, 78 Ind., 77; *Zeigler* v. *Day*, 123 Mass., 152; *Randall* v. *Baltimore & Ohio R. R. Co.*, 109 U. S. Reps., 478, 483; *Blessing* v. *St. Louis &c. R. R. Co.*, 77 Misso., 410. The only ground upon which the defendant could be held liable for negligence would be that it did not use due care in the performance of the duty that it owed to the plaintiff, of employing competent train-dispatchers, and providing proper rules to govern the movements of trains. But that it did perform this duty in both respects the finding explicitly declares. The decision of the court below rests wholly on the exploded *alter ego* doctrine, never introduced in this state, and which, were it law, does not apply to the office of a mere train-dispatcher, employed and discharged by the same superintendent and for the same general purpose as the plaintiff himself. *Davis* v. *Vermont Central R. R. Co.*, 55 Verm., 86, 90; *Lawler* v. *Androscoggin R. R. Co.*, 62 Maine, 463, 466; *National Tube Works Co.* v. *Bedell*, 96 Penn. St., 175, 179; *Brown* v. *Winona & St. Peter R. R. Co.*, 27 Minn., 162; *Valtez* v. *Ohio & Miss. R. R. Co.*, 85 Ill., 500, 502; *Kenney* v. *Shaw*, 133 Mass., 501; *Feltham* v. *England*, L. Reps., 2 Q. B., 33; *Howells* v. *Landore Siemens Steel Co.*, 10 id., 62; *Wilson* v. *Merry*, L. Reps., 1 House of Lords, Scotch Appeals, 326.

2. The rules of the company, which had been placed in Darrigan's hands, provided expressly that "the regular compensation of employees covers all risks or liability to accident." These rules measured the mutual duties of plaintiff and defendant, and virtually expressed the contract between them. *Satchwell* v. *Williams*, 40 Conn., 371.

The plaintiff's injury was the result of an accident due to a single act of negligence on the part of a competent and careful employee. It was therefore a risk which he voluntarily took upon himself with full notice.

3. Darrigan's acts and words indicating suffering, while being examined by a physician in order to prepare the latter to testify as an expert at the trial, were inadmissible. Pierce on Railroads, 298; *Rowell* v. *City of Lowell*, 11 Gray, 420, 422; *Grand Rapids &c. R. R. Co.* v. *Huntley*, 38 Mich., 537; *Wilson* v. *Granby*, 47 Conn., 59, 76. It was the duty of the court, after admitting it subject to exception, to rule it out before the conclusion of the trial. *Jacques* v. *Bridgeport Horse R. R. Co.*, 41 Conn., 61, 65. The failure to do so is not excused by the finding that "there was no material difference in the testimony of the witnesses for the plaintiff and defendant as to the extent and character of the injury, and so the court did not find it necessary to make any ruling as to the inadmissibility of said testimony." Aside from the fact that it would be dangerous to allow the right of a party to exclude improper evidence to be controlled by a finding by the court below, after judgment, that other evidence proved the same thing, the ruling falls within the doctrine of one of the recent decisions of this court, that "inadmissible evidence can never be made admissible by corroboration." *Bartholomew* v. *Farwell*, 41 Conn., 107, 111.

4. The question put to superintendent Holbrook on cross-examination was not germane to the direct examination, and tended to raise a collateral issue foreign to the case. Obviously a flag on a construction train going east could be no protection against a freight train going west on the same track. *Atwood* v. *Welton*, 7 Conn., 71.

*C. H. Briscoe* and *J. P. Andrews*, for the appellee.

1. As to the duty of the master to the servant. The following propositions of law are clearly established by a great weight of authority:—1st. That it is the duty of the master to provide all suitable and necessary instrumentalities to

the servant for the work which he is required to perform. 2d. That neglect to exercise reasonable care in furnishing such instrumentalities renders the master liable. 3d. That this duty, where the master is a corporation, is a *corporate duty*, and the neglect of the individual charged with this duty, *of whatever grade or rank*, is negligence in the *corporation*, for which it is liable. 4th. Where negligence in furnishing suitable and proper instrumentalities for the work required is shown, the fact that the master has appointed a competent agent to perform this duty *is wholly immaterial*. Pierce on Railroads, 370; Shearm. & Redf. on Negligence, § 93; Wharton on Negligence, §§ 210, 211, 212, 232; 2 Thompson on Negligence, 985; *Wilson* v. *Willimantic Linen Co.*, 50 Conn., 433, 457; *Laning* v. *N. York Central R. R. Co.*, 49 N. York, 521, 532; *Flike* v. *Boston & Albany R. R. Co.*, 53 id., 549, 553; *Besel* v. *N. York Central R. R. Co.*, 70 id., 171, 173; *Fuller* v. *Jewett*, 80 id., 46; *Sheehan* v. *N. York Central R. R. Co.*, 91 id., 332, 334; *Ellis* v. *N. York, Lake Erie & Western R. R. Co.*, 95 id., 546, 552; *Frazier* v. *Pennsylvania R. R. Co.*, 38 Penn. St., 104; *Caldwell* v. *Brown*, 53 id., 453; *Patterson* v. *Pittsburgh & Connellsville R. R. Co.*, 76 id., 389, 393; *Mullan* v. *Phila. Steamship Co.*, 78 id., 25; *Fifield* v. *Northern R. R. Co.*, 42 N. Hamp., 225; *Lalor* v. *Chicago, Burl. & Quincy R. R. Co.*, 52 Ill., 401; *Chicago &c. R. R. Co.* v. *Taylor*, 69 id., 461; *Brabbitts* v. *Chicago & N. Western R. R. Co.*, 38 Wis., 289, 296; *Mitchell* v. *Robinson*, 80 Ind., 281; *Drymala* v. *Thompson*, 26 Minn., 40; *Fay* v. *Minneapolis & St. Louis R. R. Co.*, 30 id., 233; *Brann* v. *Chicago & Rock Island R. R. Co.*, 53 Iowa, 595; *Gunter* v. *Graniteville Manuf. Co.*, 18 So. Car., 262; *Noyes* v. *Smith*, 28 Verm., 59, 63; *Davis* v. *Vermont Central R. R. Co.*, 55 id., 86, 90, 94; *Haynes* v. *East Tenn. & Georgia R. R. Co.*, 3 Coldw., 222, 227; *Gibson* v. *Pacific R. R. Co.*, 46 Misso., 163; *Brothers* v. *Cartter*, 52 id., 373; *Lewis* v. *St. Louis & Iron Mountain R. R. Co.*, 59 id., 495; *Ross* v. *Chicago &c. R. R. Co.*, 8 Fed. Rep., 544; *King* v. *Ohio &c. R. R. Co.*, 14 id., 280; *Gilmore* v. *Northern Pacific R. R. Co.*, 18 id., 870; *Hough* v. *Rail-*

*way Co.*, 100 U. S. Rep., 213, 217; *Ross* v. *Chicago &c. R. R. Co.*, 112 id., 377.

2. The plaintiff and the train-dispatcher were not, in any legal sense, fellow servants. 2 Thompson on Negligence, 971; 2 Rorer on Railroads, 832; Wood on Master & Servant, §§ 390, 436, 438, 439; *Wilson* v. *Willimantic Linen Co.*, 50 Conn., 433, 465; *Corcoran* v. *Holbrook*, 59 N. York, 517, 520; *Slater* v. *Jewett*, 85 id., 61, 68; *Sheehan* v. *N. York Central R. R. Co.*, 91 id., 332; *Dana* v. *N. York Central R. R. Co.*, 92 id., 639, 642; *Chicago, Burl. & Quincy R. R. Co.* v. *McLallen*, 84 Ill., 109; *Chicago & Alton R. R. Co.* v. *May*, 108 id., 288; *Brabbitts* v. *Chicago & N. Western R. R. Co.*, 38 Wis., 289, 297; *Washburn* v. *Nashville &c. R. R. Co.*, 3 Head, 638; *Haynes* v. *East Tenn. & Georgia R. R. Co.*, 3 Coldw., 222, 227; *Gunter* v. *Graniteville Manuf. Co.*, 18 So. Car., 262; *Kansas Pacific R. R. Co.*, v. *Salmon*, 14 Kansas, 512, 524; *Moon* v. *Railroad Co.*, 30 Alb. Law Jour., 317; *Gravelle* v. *Minneapolis & St. Louis R. R. Co.*, 11 Fed. Rep., 569, 572; *Miller* v. *Union Pacific R. R. Co.*, 12 id., 600; *Gilmore* v. *Northern Pacific R. R. Co.*, 18 id., 870; *Railroad Co.* v. *Fort*, 17 Wall., 553; *Ross* v. *Chicago &c. R. R. Co.*, 112 U. S. Reps., 377.

3. The testimony of the surgeon who examined the plaintiff, as to his acts and exclamations at the time, showing that he was in pain, was admissible; and it did not affect the matter that a suit was contemplated. 1 Greenl. Ev., § 102; Rogers on Expert Testimony, 75; *Bacon* v. *Inhabitants of Charlton*, 7 Cush., 586; *Barber* v. *Merriam*, 11 Allen, 322, 324: *Quaife* v. *Chicago & N. Western R. R. Co.*, 48 Wis., 513. But it did no harm, as the surgeon introduced by the defendants made the same statement as to the plaintiff's condition; and on this ground a new trial should not be granted even if there was an error.

CARPENTER, J. On December 14th, 1882, there were two special or irregular trains going in opposite directions on the western division of the defendant's single track railroad. These trains were run as directed by telegrams from

the train-dispatcher in the division superintendent's office at Hartford. The train going east was a construction train. About twelve o'clock it was at Southford station, where it received an order from the train-dispatcher to "run to Towantic as a special train ahead of No. 6, and then work between Towantic and Waterbury as a special train until six o'clock P. M., and protect themselves with flags against Goble special east after 1.30 P. M." The above order was given by the chief train-dispatcher. Soon after he was relieved in the regular course of business by an assistant. A little before five o'clock the same afternoon, the plaintiff's train going west received at Waterbury from the assistant train-dispatcher an order to run to Brewster's as a special. In obeying this order the two trains collided and the plaintiff was seriously injured. The court below rendered judgment for the plaintiff, and the defendant appealed.

The negligence of the train-dispatcher is admitted, but the defendant claimed that such negligence was the negligence of a fellow-servant, for which it is not liable; and that is the first question presented for our consideration.

In *Wilson* v. *Willimantic Linen Company*, 50 Conn., 433, this court held that a master was bound to provide for his servant a reasonably safe place for his work and reasonably safe appliances. An application of that principle to a railroad company would require it to keep its road bed, rolling stock, tools and implements in good and safe condition, to adopt rules and regulations adapted to its business so as to guard against accidents, and to employ skillful and competent agents and employees in every department of its service. In short, all employers shall be vigilant in the use of means and in the adoption of measures to make the servants in their employ reasonably safe. To that extent the master assumes the risk. On the other hand the servant assumes the natural and ordinary risks incident to the business, including those arising from the negligence of his fellow-servants.

To a certain extent the distinction between the two classes of risks is obvious, and in most cases it is easy to

determine on which side of the dividing line the case falls;
but along the line on either side is a wide margin of deba-
table ground.   It would be idle to attempt to notice any
considerable number of the many cases that have been
decided on this subject.   They are so conflicting that it is
impossible to reconcile them, and it is equally impossible to
extract from them any general rule or principle by which
future cases, or any considerable portion of them, may be
determined.   Differing views are entertained by different
courts in similar cases.   To some extent each case is deter-
mined by the peculiar circumstances attending it.   Nor are
the courts uniform in their statement of the principles upon
which the master's exemption rests.   In an early case the
servants are represented as engaged in a joint undertaking
in which no one, as respects the others, represents the mas-
ter, and in which each in his separate department does rep-
resent his principal, and in which each stipulates for the
performance of his several part.   Other cases place it upon
the ground that there is an implied contract by the servant
to assume the risks arising from the negligence of his fellow-
servants; and others still rest it upon grounds of public
policy.   On whatever ground it is placed the practical diffi-
culty remains—who are fellow-servants, and who represent
the company ?

In *Chicago, Milwaukee & St. Paul Railway Co.* v. *Ross*,
112 U. S. Reps., 377, the Supreme Court of the United
States, by a divided court, held that the company was liable
to an engineer for the negligence of the conductor.   The
court say :—" There is, in our judgment, a clear distinction
to be made in their relation to their common principal, be-
tween servants of a corporation exercising no supervision
over others engaged with them in the same employment,
and agents of the corporation clothed with the control and
management of a distinct department, in which their duty
is entirely that of direction and superintendence.   A con-
ductor, having the entire control and management of a rail-
way train, occupies a very different position from the
brakeman, the porters, and other subordinates employed.

He is in fact, and should be treated as, the personal representative of the corporation, for whose negligence it is responsible to subordinate servants. This view of his relation to the corporation seems to us a reasonable and just one, and it will insure more care in the selection of such agents, and thus give greater security to the servants engaged under him in an employment requiring the utmost vigilance on their part, and prompt and unhesitating obedience to his orders. The rule which applies to such agents of our railway corporations must apply to all, and many corporations operate every day several trains over hundreds of miles at great distances apart, each being under the control and direction of a conductor specially appointed for its management. We know from the manner in which railways are operated that, subject to the general rules and orders of the directors of the companies, the conductor has entire control and management of the train to which he is assigned. He directs when it shall start, at what speed it shall run, at what stations it shall stop and for what length of time, and everything essential to its successful movements, and all persons employed on it are subject to his orders. In no proper sense of the term is he a fellow-servant with the fireman, the brakeman, the porters and the engineer. The latter are fellow-servants in the running of the train under his direction, who, as to them and the train, stands in the place of and represents the corporation." Then, after citing several cases, the court adds:—" We agree with them in holding—and the present case requires no further decision—that the conductor of a railway train, who commands its movements, directs when it shall start, at what stations it shall stop, at what speed it shall run, and has the general management of it, and control over the persons employed upon it, represents the company ; and therefore that for injuries resulting from his negligent acts, the company is responsible." We do not make these quotations as necessarily expressing our views upon a case like that, for the case at bar does not call for it, but for the purpose of showing the position of that court.

In *Sheehan* v. *N. York Central & Hudson River R. R. Co.*, 91 N. York, 332, the facts were these:—Train 337, an irregular or special train called " Wild Cat," was going west from Auburn. Train 50 was a regular train going east from Cayuga. The latter was due at Cayuga at 4.40 P. M., and would go east at 4.45 by schedule. At 4.46 the superintendent telegraphed to 337, " Wild Cat to Cayuga regardless of No. 50." No notice was given to No. 50, and no rule of the company required it, but the superintendent telegraphed to the telegraph operator at Cayuga to hold No. 50 for orders. The operator told the conductor to hold No. 50 for train No. 61. He neither exhibited nor delivered any message; no rule of the company required him to do either. No. 61 came in soon after and No. 50 started towards Auburn. In a few moments it collided with No. 337 and the plaintiff was injured. The court say:—" It was not disputed at the trial, nor is it upon this appeal, that the dispatching of train 337 and the holding of train 50 were within the province of the superintendent, nor that, in respect thereto, he represented the defendant in its corporate capacity. Clearly he held that relation."

The defendant's counsel, in commenting upon that case, suggest that the case turned upon the defective nature of the general rules governing the movement of trains, which permitted the telegraph operator to deliver a train order verbally to the conductor. In respect to this the court say:—" The peremptory order of the superintendent to go forward regardless of No. 50 was an assurance that the track would be free and safe for the journey, and required the defendant to take reasonable precautions to make it so. The rules of the company did not require the telegraph operator to submit the message received by him to the conductor or engineer of train 50, nor a communication back from these persons that they had received and understood the order; an omission of either circumstance was the act of the defendants, and in the absence of other precautions might properly be held to constitute negligence." It is obvious that the court regarded the superintendent, who

acted as train-dispatcher, as the representative of the corporation, and that his negligence was the negligence of the defendant. He failed to give an effective order to hold No. 50, which he might and should have done regardless of rules. In that he, and through him the company, was negligent. And none the less so that the company had failed to establish suitable rules. The intimation of the court is clear that the company was responsible on both grounds.

In *Chicago, Burlington & Quincy R. R. Co.* v. *McLallen,* 84 Ill., 109, the conductor of a special freight train received an order from the assistant superintendent directing him to run fifteen minutes behind the time of a regular freight train. In doing so he came in collision with a regular passenger train going in the opposite direction. The conductor was killed. No notice was given to the passenger train. The company was held liable. The court say :— " As between the conductor and company, the assistant superintendent, to whose orders the trains are all subject, is the representative of the corporation. His orders to the conductor of a train are essentially the orders of the employer. This rule applies as well to all orders issued by his assistants in office and issued in his name. These orders were all signed in the name of Campbell, the assistant superintendent. If those intrusted by him with the management of the business of the corporation, by orders issued in his name, neglect to issue a necessary order, that is his neglect and the negligence of the corporation."

In Kansas in a similar case the court say :—" And those higher officers, agents or servants cannot, with any degree of propriety, be termed fellow-servants with the other employees who do not possess any such extensive powers, and who have no choice but to obey such superior officers, agents or servants. Such higher officers, agents or servants must be deemed in all cases, when they act within the scope of their authority, to act for their principal, and, in fact, to be the principal."

It is conceded by the defendant's counsel that in Ohio,

Illinois, Tennessee and Kentucky, the law is substantially as indicated by the authorities above referred to.

On the other hand it must be conceded that the cases above named and others of like import are a departure from the general current of authorities elsewhere. A conductor and brakeman have been held to be fellow-servants in Indiana and Michigan. *Thayer* v. *St. Louis, &c. R. R. Co.*, 22 Ind., 26; *Smith* v. *Flint, &c. R. R. Co.*, 46 Mich., 258. So also an overseer and a laborer under his charge. *Brown* v. *Winona & St. Peter R. R. Co.*, 27 Minn., 162. And a foreman and workman under him. *Keystone Bridge Co.* v. *Newbury*, 96 Penn. St., 246; *Danbert* v. *Picket*, 4 Misso. App., 591; *Hoth* v. *Peters*, 55 Wis., 405; *Peterson* v. *Whitebreast Coal & Mining Co.*, 50 Iowa, 674. In Massachusetts they have pretty rigidly adhered to the doctrine of the leading case of *Farwell* v. *Boston & Worcester R. R. Co.*, 4 Met., 49. In one case there was an apparent weakening. *Ford* v. *Fitchburg Railroad Co.*, 110 Mass., 260. But the court soon took pains to prevent that case from being regarded as a departure from the general rule. *Holden* v. *Fitchburg Railroad Co.*, 129 Mass., 268. In that case GRAY, C. J., says:—"If a master uses reasonable care in employing suitable servants, in supplying and keeping in repair suitable structures and engines, and in giving proper directions and taking due precautions as to their use, he is not responsible to one servant for the negligence of another in the management and use of such structures and engines in carrying on the master's work." In another place he adds:—"And it makes no difference that the servant whose negligence causes the injury is a sub-manager or foreman of higher grade or greater authority than the plaintiff."

In *Feltham* v. *England*, L. R., 2 Q. B., 33, it is said that the rule of exemption is not altered by the fact that the servant guilty of negligence is a servant of superior authority whose lawful directions the other is bound to obey. In *Wilson* v. *Merry*, L. R., 1 H. L., Scotch Appeals, 326, the Lord Chancellor says:—"But what the master is, in my opinion, bound to his servant to do, in the event of his not

personally superintending and directing the work, is to select proper and competent persons to do so, and to furnish them with adequate materials and resources for the work. When he has done this he has, in my opinion, done all that he is bound to do."

It seems to us that the rule prevailing in Massachusetts, and which did prevail in England previous to the passage of the "Employers' Liability Act," hereinafter referred to, unduly enlarges the exemption and confines the liability of employers within too narrow limits. If such a rule had been followed in *Wilson* v. *Willimantic Linen Co.*, before referred to, the decision must have been otherwise. The rule we think does not sufficiently recognize the distinction between agents, managers, and even superintendents, on the one hand, and mere servants and common laborers on the other; between duties which the master is required to perform and work which is ordinarily performed by employees. It makes little allowance for emergencies, and does not sufficiently regard the obvious fact that cases are constantly arising, especially in the operation of railroads, which no general rule can provide for, in which the master must be regarded as constructively present, and in which some one must be invested with a discretion and a right to speak and command in his name and by his authority. Such a right carries with it the corresponding duty of obedience—some one must hear and obey. To make no discrimination, but in all cases to place those who are invested with authority to direct and control on the same footing with those whose duty it is merely to perform as directed without discretion and without responsibility, seems to us unwise and impolitic.

The duties of a master in most cases are easily distinguished from those of an employee. The proprietor of a cotton mill is bound to have a safe building, a safe dam or engine, and safe machinery; and he is bound to keep them so. To do that he must employ skilled mechanics, who perform his duties. Their negligence is his negligence. The English rule says that he has done his whole duty when he

has employed skillful, careful men to do this work. We think that a more salutary rule would be to require him to see that the work is actually done with care and skill; to require him to inspect the work personally if competent, and if not, to employ others who are, and who will exercise more than ordinary care, so as to make it reasonably certain that the operatives will be surrounded by safe machinery and appliances. The liability of the master for the negligence of such agents is a surer guarantee of safety than immunity.

The diligence required will be the greater as the danger and hazards increase. The operation of a railroad requires a greater degree of care than the operation of a cotton mill. It is the duty of a railroad corporation to prepare a time table and adjust the running of its trains so as to avoid collisions. It must also devise some suitable and safe method by which to run special and irregular trains, and regular trains when off their regular time. That cannot be done by general rules. Emergencies will arise which no system of rules can anticipate and provide for, in which the company must act, and act promptly and efficiently. In this case the scheme devised was to have these trains controlled by one who knew the position and movement of every train on the road liable to be affected by them—a train-dispatcher, acting in the name and by the authority of the superintendent. Is there not a wide and manifest difference between the duty of such an agent and the duty of a locomotive engineer? The duty of the former pertains to management and direction, that of the latter to obedience. It is immaterial that these men are hired and paid by a common employer, and that their employment is designed to accomplish one common result. That argument, if pressed to its logical conclusion, would obliterate all distinctions among those engaged in railroad business, from the president down to the humblest servant, and would practically exempt the company from all duty and all liability to those in its service.

A reference to the rules of the company in connection

with the facts will serve to show that the views above ex-
pressed are applicable to this case. Here were two irregu-
lar trains to be moved in opposite directions on a single
track railroad so as to pass each other. It was necessary
that their movements should be directed by instructions
emanating from some one intelligent source. The rules of
the company provide for moving trains by special orders.
One rule is, "All orders shall be given by a superintendent,
or by a dispatcher appointed for that purpose, under direc-
tions of a superintendent; no other person will be allowed
to give them." Another rule is, "Division superintend-
ents are supreme on their respective divisions, and are
responsible only to the management for such orders as they
may give." The following is from the finding of the
court :—"So far as the printed rules and regulations of the
company did not govern, the train-dispatcher was author-
ized to give such orders for the movement and protection
of trains as he saw fit, and while so acting he had all the
authority of, and acted in the stead and place of, the
division superintendent."

The train-dispatcher then, in respect to the matter of
moving these trains was supreme. The whole power of the
corporation whose duty it was to move them safely, was
delegated to him. He was the agent through whom the
corporation attempted to perform its duty. He acted in its
name, by its authority, and in its stead. The engineer was
bound to obey his order. Disobedience or deviation would
have been subversive of order and discipline, destructive in
its consequences, and just cause for immediate dismissal.
He received an order to go west from Waterbury on a
single track road at a time when another train was approach-
ing Waterbury from the west. The order was imperative
and it required of him implicit obedience. He obeyed.
He did not then know the consequences, but the company
did or should have known. He conformed to the order as
he was bound to; and while so conforming, and as the
direct consequence thereof, he was injured. Reason, justice
and law require that the company should be held respon-
sible.

Another rule provides that " in emergencies each employee must promptly obey the orders of any superior officer." By that rule the company made the order of that officer, whoever he may be, and of whatever grade he may be, its own.   If the order is an improper one, and, in executing it, another employee is injured, the company should be respon- sible.   In such a case the grade of service becomes and is material.

That rule too in its spirit had an application to the case. There was something in the nature of an emergency.   There was no room for divided counsels; there must be unity of purpose and one mind must control.   That power and duty devolved upon the train-dispatcher.

It is worthy of notice that the principles which we think should govern this case have been embodied in an act of Parliament and are now the law of England.   The decisions of her courts on this question have been overruled by stat- ute.   In 1880 the " Employers' Liability Act" was passed, the first section of which is as follows :—

" When, after the commencement of this act, personal injury is caused to a workman—(1) by reason of any defect in the condition of the ways, works, machinery or plant connected with or used in the business of the employer; or (2) by reason of the negligence of any person in the service of the employer who has any superintendence entrusted to him, whilst in the service of such superintendence ; or (3) by reason of the negligence of any person in the service of the employer to whose orders or directions the workman at the time of the injury was bound to conform, and did conform, when such injury resulted from his having so con- formed ; or (4) by reason of the act or omission of any person in the service of the employer, done or made in obedience to the rules or by-laws of the employer; or (5) by reason of the negligence of any person in the service of the employer who has the charge or control of any signal, points, locomotive engine, or train upon a railway ;—the workman, or, in case the injury results in death, the legal personal representative of the workman, and any person enti-

tled in case of death, shall have the same right of compensation and remedies against the employer as if the workman had not been a workman of nor in the service of the employer nor engaged in his work." The act limits the amount to be recovered in certain cases; and will cease to be operative at the end of seven years unless re-enacted.

Among the rules of the company which had been placed in the plaintiff's hands is the following:—"The regular compensation of employees covers all risk or liability to accident." The record does not show that the defendant claimed in the court below that this was equivalent to a contract exempting it from liability for its own negligence; nor do the reasons of appeal present any such question. When such a question is presented we may be called upon to consider whether public policy will permit a railroad company to make such a contract with its employees.

The plaintiff offered a surgeon as an expert. The witness had examined the plaintiff's injuries, and was asked to state the result of his examination. In doing so, against the objection of the defendant, he testified to actions and words of the plaintiff, while being so examined, indicating pain and suffering. The defendant objected, on the ground that the witness was not consulted by the plaintiff for treatment but for the purpose of being at some time used as a witness. This evidence was taken subject to the objection, but the court subsequently made no ruling on the subject. We think the evidence was clearly inadmissible. Pierce on Railroads, 298; *Grand Rapids & Ind. R. R. Co.*, v. *Huntley*, 38 Mich., 537. If otherwise easy facilities would be furnished for parties to introduce in evidence their own declarations, made out of court, not under oath, and when the temptation to exaggerate, and even to utter untruths, would be pretty strong. Ordinarily when a patient consults a physician with a view to treatment he will state the facts as they are; but, unfortunately, when a party consults a physician preparatory to the trial of his case simply, his statements are not always reliable. But it does not necessarily follow that the defendant is entitled to

Darrigan *v.* N. York & N. England R. R. Co.

a new trial. The statute, (Session laws of 1882, p. 146,) requires the court, if it finds errors in the rulings or decisions of the court below, to reverse the judgment or order a new trial, unless such errors are immaterial or such as have not injuriously affected the appellant.

The extent of the injury, although material in its bearing upon the amount of damages, was not a point seriously controverted. The main contention seems to have been on the question of liability. In respect to this evidence the court finds that "afterwards the defense called a surgeon who had examined Darrigan, and there was no material difference in the testimony of the witnesses for the plaintiff and the defendant as to the extent and character of the injury." The evidence objected to agreeing substantially with that offered by the defendant, it is evident that it did not influence the judgment. We think that the exception in the statute was designed to apply to a case like this, and that for such an error under such circumstances we ought not to order a new trial.

The division superintendent was placed upon the stand as an expert by the defendant, and he testified that the rules of the company were suitable and proper rules and that they could not be improved. On the cross-examination he was asked, against the objection of the defendant, if that construction train had not been run up to a time immediately preceding the day of the accident under rules requiring it to protect itself against all trains by flags. The view we have taken of this case renders this question unimportant. We are inclined to think however that the question had a general bearing upon the subject of the direct testimony of the witness and that there was no error in allowing the question to be put. But if otherwise the defendant was not harmed by it, because the court found that "the rules and regulations of the defendant company governing the movements of trains were in themselves proper and sufficient rules, and if complied with no collision could take place."

For these reasons we do not order a new trial.

In this opinion the other judges concurred, except GRANGER, J., who dissented.