Belknap,  }
April 5, 1904. }

# WALLACE *v.* BOSTON & MAINE RAILROAD.

In an action against a railroad company to recover for injuries sustained by a brakeman in a collision between opposing trains, certain evidence deemed insufficient to warrant a submission of the question whether rules of the corporation relating to the movement of trains were ambiguous and confusing, and consequently unreasonable.

In such action, evidence that the employees in charge of the colliding trains placed opposite constructions upon rules of the company, and that the effect of orders issued in duplicate for the government of both trains was the subject of discussion, is not competent on the question of the interpretation of the rules, although it is admissible as a part of the *res gestæ*, in explanation of subsequent conduct; and evidence that on prior occasions the same trainmen disregarded plain provisions of the rules for the movement of trains is not admissible, when it appears that such practice was not customary and that the company had no knowledge thereof.

A dispatcher charged with the duty of directing the movement of trains over a railroad is not the fellow-servant of a brakeman who suffers injury through the improper issuance of such orders, within the rule exempting the master from responsibility for injuries resulting to one employee from the negligence of another in the same service.

Where the rules of a railroad company provide that there should be at least one telegraph office between those at which opposing trains receive meeting orders, a disregard of such regulation by a train dispatcher without sufficient cause is evidence of negligence on the part of the corporation.

Whether a railroad collision resulted from the error of a train dispatcher in the transmission of orders, or from a violation of the company's rules by trainmen, or from both causes concurrently, is a question of fact.

CASE, for negligence. Trial by jury. At the March term, 1902, of the superior court a nonsuit was ordered by *Pike*, J., at the close of the plaintiff's evidence and subject to his exception.

The plaintiff was head brakeman on the defendants' north-bound, regular freight train, known as No. 265, on September 14–15, 1900, and was injured in a head-on collision between it and a south-bound, extra freight train, known as freight extra 460, about half a mile north of the Weirs station. The following orders were sent to each train by the train dispatcher from his office at Woodsville:

Order No. 56: "No. 265, two sixty-five, and freight extra 460, four sixty, will meet at Lakeport."

Order No. 59: "No. 265, two sixty-five, and freight extra 460, four sixty, will meet at Weirs instead of Lakeport."

Order No. 61: "Order No. 59 is annulled."

The orders for train No. 265 were all addressed to the conductor and engineer of the train, and were sent to Lakeport. Order No. 56 was marked "O. K." at 10:10 p. m. on September 14, No. 59 at 11:46, and No. 61 at 11:48. The train was stopped at Lakeport by a red signal, and the conductor and engineer read and signed the orders. Their signatures were telegraphed to the train dispatcher, who made the orders "complete,"—No. 56 at 11:55 p. m., and Nos. 59 and 61 at 11:56,—by one message applying to both. Shortly after this, the conductor and engineer took the three orders and started their train, intending to run to Plymouth without a stop.

The orders for freight extra 460 were addressed to the conductor and engineer, No. 56 being sent to Plymouth and Nos. 59 and 61 to Meredith. No. 59 was marked "O. K." at 11:37 p. m., and No. 61 at 11:45. The train was stopped at Meredith by a red signal, and the conductor and engineer found order No. 59 awaiting them. They signed it and their signatures were telegraphed to the train dispatcher. When order No. 61 arrived they signed it, and their signatures were telegraphed to the train dispatcher, who made Nos. 59 and 61 "complete" by one message applying to both. Shortly after this the telegraph operator gave them order No. 61, and a few minutes later order No. 59, the latter having upon its face the words "Annulled by order No. 61" written thereon after the orders were signed. The conductor and engineer took the orders, and the red signal having been taken in, they started with the intention of running to Lakeport without a stop. The collision occurred shortly afterward.

The negligence alleged was (1) that the train dispatcher blundered in sending the orders; (2) that the rules relating to the running of trains were ambiguous and confusing, and consequently unreasonable; and (3) that there was no telegraph office open between Lakeport and Meredith when the orders were given.

The following rules of the defendants were in evidence:

"1. (b) Employees must be conversant with and obey the rules and special instructions. If in doubt as to their meaning, they must apply to proper authority for an explanation.

"26. (b) A red flag or a red light shown at telegraph stations signifies that orders are awaiting the train. Conductors and engineers must repair to the telegraph office before doing other work. . . . Under no considerations must a train or engine pass these signals without getting a train order or a clearance showing for what the signal is displayed.

"106. In all cases of doubt and uncertainty, take the safe course and run no risks.

"201. Special orders directing movements [of trains] varying

from or additional to the time-table will be issued by the authority and over the signature of the superintendent, train dispatchers adding their own initials. . . . They must be brief and clear, and the prescribed forms must be used when applicable.

"202. Each order must be given in the same words to all persons or trains directly affected by it, so that each shall have a duplicate of what is given to the others.

"203. Orders shall be numbered consecutively for each day as issued, beginning with No. 1 at midnight.

"(a) Orders must be plain and explicit, and if not fully understood, an explanation must be required before accepting the same. After the reception of an order, it must be obeyed fully.

"204. Orders must be addressed to those who are to execute them, naming the place at which each is to receive his copy. Those for a train must be addressed to the conductor and engineman. . . . A copy for each person addressed must be supplied by the operator.

"208. Meeting orders must not be sent for delivery to trains at the meeting point, if it can be avoided. When it cannot be avoided, special precautions must be taken by the train dispatchers and operators to insure safety. There should be at least one telegraph office between those at which opposing trains receive meeting orders.

"After ' O. K.' has been given and acknowledged, and before ' complete ' has been given, the order must be treated as a holding order for the train addressed, but must not be otherwise acted on until ' complete ' has been given.

"210. When an order has been transmitted, preceded by the signal ' 31,' operators receiving it (unless otherwise directed) repeat it back at once from the manifold copy, and in the succession in which their several offices have been addressed. Each operator repeating must observe whether the others repeat correctly. After the order has been repeated correctly by the operators required at the time to repeat it, the response ' O. K.', authorized by the train dispatcher, will be sent simultaneously to as many as practicable, naming each office. Each operator must write this on the order, with the time, and then reply ' i i O. K.', with his office signal. Those to whom the order is addressed must sign their names to the order, the lowest copy to be retained by the operator, and he will send their signatures to the superintendent. The response ' complete ', with the superintendent's name, will then be given, when authorized by the train dispatcher. Each operator receiving this response will then write on each copy the word ' complete ', the time, and his name in full, and will then deliver a copy to each person included in the address ; and each must read his copy

aloud to the operator. Conductors will read the order to their baggage masters and brakemen, and enginemen to their firemen, and know that they understand them.

" 217. (a) A train must be governed strictly by the terms of orders addressed to it, and must not assume rights not conferred by such orders. In all other respects it must be governed by the train rules and time-tables.

" 220. Orders once in effect continue so until fulfilled, superseded, or annulled.

" 221. A signal must be used at each train-order office, which shall display red when trains are to be stopped for orders. When an operator receives a signal ' 31 for — ', he must immediately display red and then reply ' red displayed for — ', and sign his name. The signal must not be removed until the object for which red is displayed is accomplished. When red is displayed, all trains must come to a full stop, and must not proceed without receiving an order addressed to such train, or a clearance card on a specified form, stating over the operator's signature for what the signal is displayed.

" Form A. Fixing meeting point for opposing trains: '— and — will meet at — ' . . . Trains receiving this order will, with respect to each other, run to the designated point, and having arrived there will pass in the manner provided by the rules.

" Form L. Annulling or superseding an order: ' Order No. — is annulled.' This will be numbered, transmitted, and signed for as other orders. If an order which is to be annulled has not been delivered to a train, the annulling order will be addressed to the operator, who will destroy all copies of the order annulled but his own, and write on that, ' — annulled by order No. — ' .

" An order superseding another may be given, adding ' this supersedes order No. — ', or adding ' instead of — '. An order that has been annulled or superseded must not be again restored by special order under its original number."

Evidence offered by the plaintiff upon the following points was excluded, subject to exception: (1) That the conductor and engineer of the down train put a construction upon the rules relating to the running of trains different from that put upon them by the conductor and engineer of the up train; (2) that the operator at Lakeport, after a discussion as to the effect of the orders, asked the train dispatcher whether any orders were outstanding against No. 265, and the latter replied " No "; (3) conversations between the trainmen and the operators at Meredith and Lakeport as to the effect of the orders; (4) that a number of times before the accident the conductor and engineer of freight extra 460, after signing orders, had asked the operator for them and had been told that

they were annulled, and the red light was thereupon taken in and they went on, but there was no claim that this had occurred frequently enough to amount to a custom, nor that the defendants knew of the occurrences.

The telegraph office at Weirs was the only one between Lakeport and Meredith, and it was not kept open nights after September. After freight extra 460 was reported to the train dispatcher as having left Meredith, he tried to get the Weirs office, hoping that the operator might chance to be within hearing. The accident might have been avoided if the office had been open. It was marked as a night office on the time-table then in force.

*Shannon & Young* and *Charles B. Hibbard*, for the plaintiff.

*Jewett & Plummer* and *Streeter & Hollis*, for the defendants.

CHASE, J. The train dispatcher's final decision was to have train No. 265 and freight extra 460 meet at Meredith. He must have arrived at this decision some time before 11 : 45 p. m. of the clock, for the order (No. 61) which he issued to carry the decision into effect was marked " O. K." at that time, showing that it had then been transmitted and repeated back to him. Rule 210. Apparently, train No. 265 had not arrived at Lakeport, for the orders addressed to its conductor and engineer were not completed until 11 : 55 and 11 : 56. Freight extra 460 was at Meredith. Order No. 56 had been completed and delivered to the trainmen at Plymouth, and the train had been run to Meredith upon it. It had not been completed and delivered to the other train. Order No. 59 had not been completed and delivered to either train. This appears from the fact that orders Nos. 59 and 61 were completed by a single message for both trains. The dispatcher's decision required that orders Nos. 56 and 59 should both be made void, so far as they were then executory.

The defendants' rules contain forms for annulling and superseding orders, and prescribe with great detail how they shall be addressed, transmitted, and delivered. One provision is that " if an order which is to be annulled has not been delivered to a train, the annulling order will be addressed to the operator, who will destroy all copies of the order annulled but his own, and write on that "— annulled," etc. As order No. 59 had not been delivered to either train, this rule applied to the situation in respect to that order. If the rule had been complied with, copies of the order would not have been delivered to the conductors and engineers of the trains, and the order could have had no effect upon their action, except the incidental effect of requiring them to stop their trains

at the stations where they were to receive the order (Rule 26 b), and to hold them there for the time being. Rule 208. This effect would arise, not from the terms of the order, but from the provisions of the rules. The result would be that the only order the conductor and engineer would have would be order No. 56. The only effect order No. 59 would have upon No. 56 would be to suspend the latter's operation temporarily. It would not supersede that order, for the reason that it would not be a completed, forceful order. It would be cancelled while in a formative, incomplete state, and in the course of transmission from the dispatcher to the trainmen.

The defendants' position, that an order is delivered to the trainmen, within the meaning of the rules, when they sign it, cannot be sustained without doing violence to the meaning of common and unambiguous words. An order is not made by a single act. There are eight distinct steps in the process of its formation and delivery: (1) Transmission by the dispatcher to the operator; (2) repetition back by the operator to the dispatcher; (3) response of " O. K." by the dispatcher; (4) acknowledgment of the response by the operator; (5) signing by the trainmen; (6) transmission of signatures to the train dispatcher; (7) response of " complete " by the dispatcher, accompanied with the superintendent's name; and (8) delivery to the trainmen. Rule 210. The terms of the rule relating to the fifth step are: " Those to whom the order is addressed must sign their names to the order, the lowest copy to be retained by the operator, and he will send their signatures to the superintendent." Nothing is here said directly or indirectly tending to show that the signing is regarded as delivery in any sense or for any purpose. The evident object of the provision is to make it certain that the dispatcher is in direct communication with the trainmen. The order does not have the signature of the superintendent until the seventh step is taken. Until then, it carries no authority and is not ready for delivery. Rule 210. Then comes the eighth step: " Each operator receiving the response will *then* write on each copy the word ' complete,' the time, and his name in full, and will *then deliver* a copy to each person included in the address." The words here italicized cannot be ignored. The terms interpret themselves; there is no ambiguity to be removed. When an order is thus delivered, and not before, it becomes operative, or goes into effect. Until then it does not reach the trainmen as an order, although they may know it has been started on the way to them. The words " delivered to a train," in the rule which applied to the situation of order No. 59, are equally unambiguous. There is nothing in them or their connection tending to show that " delivered " was here used in a dif-

ferent sense from that of the word in Rule 210. It is suggested that trainmen learn of an order when they sign it; and if an annulling order is subsequently issued, it should be addressed and delivered to them for the purpose of removing from their minds the impressions thus gained. If this were so, it would not justify the substitution by interpretation of the word " signed " for the words " delivered to a train," in reading the rule. But such necessity does not exist; the rules make ample provision against the rise of evil consequences from such impressions. The trainmen are prohibited from acting upon an order otherwise than to hold their train at the station until the order has been completed; and then before acting they are required to read the order aloud to the operator and their subordinates, and know that the latter understand the order. Rule 210. It is inconceivable that trainmen conversant with and governed by the rules would act upon impressions gained by reading an order before its completion and delivery to them, unless guilty of gross disobedience or negligence. What is meant by a " train " is shown by Rule 204, which provides that " orders must be addressed to those who are to execute them," and " those for a train must be addressed to the conductor and engineer," etc. "Delivered to a train " means delivered to the conductor and engineer of the train—the persons who are to execute the order.

If the dispatcher had addressed order No. 61 to the operator in accordance with the requirement of the rule, order No. 56 would have been left outstanding, as stated above; and it would be necessary for him to send another order annulling that order, to carry his decision into effect. As order No. 56 had been delivered to freight extra 460, and had been acted on, the new order should be addressed and delivered to the conductor and engineer of that train. It should be addressed to the operator at Lakeport, since order No. 56 had not been delivered to the other train. Rule 202, requiring that " each order must be given in the same words to all persons or trains directly affected by it, so that each shall have a duplicate of what is given to the others," does not require that the order shall be given to the conductor and engineer of both trains if given to those of one, or to both operators if to one, but leaves this matter to be governed by the circumstance whether the order to be annulled has been delivered to the train. The rules leave nothing to the discretion of the dispatcher with respect to any of these matters; they are specific and peremptory. Such compliance with the provisions of the rules would leave train No. 265 without special orders, and freight extra 460 without any orders for running from Meredith; and if the rules were observed by the trainmen of both trains, the train dispatcher's decision would be exe-

cuted. The rule was sufficient to cover the situation, and was so unambiguous in terms as not to allow of interpretation in the usual sense of that word and as to be readily understood by the average man. It would be hardly possible for a person of average prudence, conversant with it and the other rules (Rule 1 b), to be misled by orders issued in accordance with it.

The defendants say that the course adopted by the dispatcher was designed to have, and in fact did have, the same effect as the orders above mentioned would have, and that the rules authorized this course ; in other words, they say that order No. 59 superseded order No. 56, and order No. 61 annulled No. 59, leaving no order outstanding. It is true that the terms of the latter order are sufficient in form and substance to supersede the earlier order. The only question is whether it had sufficient existence to have the force of an order. The position that it had such force after it was signed by the trainmen, and before it was delivered, has already been considered and found to be untenable. As it and the annulling order (No. 61) were completed and delivered simultaneously, it in fact did not have the force of an order for any appreciable length of time. When it was completed and delivered, it was not the dispatcher's intention that the trains should meet at "Weirs instead of Lakeport"; he had previously decided that the trains should not meet at that point. The only effect he intended the order should have, and the only effect now attributed to it, is a superseding or annulling effect upon order No. 56. To give it this effect, it is necessary to hold, contrary to the fact, that it was in force for an appreciable length of time, and consequently that it was effective for this purpose and this purpose only. It is apparent that the rules relating to superseding orders were not intended to be used for such purpose. If they were, it might be found that rules which required such refinement of reasoning in their administration were not reasonable and sufficient for the government of employees in the dangerous business of operating a railroad. The fact that the rules provide a special method for annulling an order—a method that is simple, direct, and positive— is conclusive evidence that the framers of the rules did not intend that a superseding order should be used for the mere purpose of annulling an order or rendering it void.

The defendants further say that if the dispatcher addresses an annulling order to the conductor and engineer when he should have addressed it to the operator, the error is a matter of no concern to the trainmen ; that their duty is to obey the order without questioning its correctness. It is true that it is the duty of the trainmen to obey the orders received ; but the dispatcher's error in such case may convey to them a wrong impression as to his inten-

tion, and cause error in the act of obedience, especially if the order sent is not clearly authorized, under the circumstances, by the rules. The trainmen and the dispatcher are governed by the rules,—one as much as the other. The trainmen interpret the dispatcher's orders in the light of the rules. In this case they were called upon to determine what the dispatcher intended by orders Nos. 59 and 61. When the orders are read in the light of the rules and of the fact that they were completed and delivered simultaneously, their meaning is equivocal. The conductor and engineer of one train may have understood his intention to be to annul No. 59 solely, while the conductor and engineer of the other train may have understood it to be to annul No. 56 also, through the superseding effect of No. 59 upon that order. If the trainmen were in fault for acting while in doubt (Rule 105), or for not requiring an explanation from the dispatcher before accepting his order (Rule 203 a), this fact would not necessarily relieve the defendants from responsibility for injuries arising from the orders and their execution, if the defendants are responsible for the dispatcher's fault. It would be a question of fact whether the injuries were attributable solely to the dispatcher's error, or solely to the trainmen's fault, or to both concurrently; and the defendants' liability would depend upon the fact found. *Matthews* v. *Clough,* 70 N. H. 600.

The plaintiff further says that the train dispatcher, by sending order No. 59 to Meredith for a meeting of the trains at Weirs, violated Rule 208, by which it is provided that "there should be at least one telegraph office between those at which opposing trains receive meeting orders." The opposing trains received the meeting order at Meredith and Lakeport respectively, and there was no telegraph office between these stations that was open at night. The defendants are not in a position to assert that a rule of this kind is not reasonably necessary for the safety of their employees and patrons, and that a disregard of it may not be negligence under some circumstances. *Louisville etc. R'y* v. *Heck,* 151 Ind. 292, 302; *Baltimore etc. R. R.* v. *Camp,* 31 U. S. App. 213. It will be observed that the terms of the rule are "there should be" one telegraph office, etc.; not "there must be." It is a reasonable inference from the adoption of this form of expression, that while under ordinary circumstances there should be an intervening office, yet the circumstances may be such at times as to justify the sending of a meeting order to stations between which there is no telegraph office. In fact, the first part of the rule shows that it was in mind that there might be emergencies when it would be necessary to send meeting orders to the meeting station. But occasions for a departure from the safer course of having an intervening telegraph office are evidently regarded by

the rule as exceptional, and a departure from it will not be justifiable unless there is a reasonable cause for it. There was no evidence of any unusual circumstances on this occasion that made it necessary or expedient to depart from the ordinary course prescribed by the rule. So far as appears, the order might have been sent to the south-bound train at the next station northerly of Meredith having an open telegraph office, or it might have been withheld from both trains, leaving them to meet at Lakeport in accordance with order No. 56, without endangering other trains, or causing unreasonable delay or inconvenience in the defendants' business. As the case stood when the nonsuit was ordered, the jury might properly have found that the rule under consideration was departed from without sufficient cause, and that there was negligence on the part of the train dispatcher in so doing. It should be remarked also in this connection, that if, in the transaction of the defendants' ordinary business, it was necessary frequently to send meeting orders to trains at Meredith and Lakeport in the night-time, this would be a reason why the defendants should keep the telegraph office at Weirs open nights. A failure to do so would render compliance with the rule impossible in such cases, and would be evidence of negligence.

There was no error in the order of nonsuit so far as it was based on the holding that the defendants' rules were not ambiguous and confusing, and consequently unreasonable. But if the defendants are responsible to the plaintiff for the negligence of the train dispatcher, the evidence bearing on the question of negligence and its consequences was not so conclusive in favor of the defendants as to warrant the order, and the nonsuit must be set aside.

If the dispatcher and the plaintiff were fellow-servants, engaged in the defendants' common undertaking, the plaintiff, by the contract of employment, impliedly, if not expressly, assumed the risk of injury from the dispatcher's negligence, and the defendants are not liable in this action. On the other hand, they are liable if the dispatcher represented them in performing the acts under consideration. Whether he was a fellow-servant or a representative of the defendants does not depend upon his rank or the grade of his service, but upon the inherent nature of the acts he was delegated to do. It is well settled law that the master owes his employees generally the duty of providing them with a reasonably safe place to work in and reasonably suitable machinery and tools to work with, and of maintaining all these in a reasonably suitable condition and state of repair for such uses. *Fifield* v. *Railroad*, 42 N. H. 225; *Jaques* v. *Company*, 66 N. H. 482; *McLaine* v. *Company*, 71 N. H. 294; *Galvin* v. *Pierce*, *ante*, *p.* 79. The provision of these things is absolutely essential to the inauguration and

prosecution of the business. Without a suitable place in which to work and suitable machinery and tools to work with, the business could not be carried on. The author or prosecutor of the business must of necessity provide them. If he entrusts the making of the provision to others, it is nevertheless distinctively his act—the act of providing instrumentalities for carrying on the business, as distinguished from acts done in the use of the instrumentalities; a supreme or masterful act, as distinguished from a subordinate or servile act. The general rule of law applies, and the doer of the act owes to his employees the duty of exercising ordinary care to avoid injuring them by the act. *Story* v. *Railroad*, 70 N. H. 364, 385. The duty, like the act, is personal to the master; it is the master's duty. It remains with him, notwithstanding he delegates its performance to another. It is positive and non-delegable—a "direct, personal, and absolute obligation, from which nothing but performance can relieve" the master. 2 Labatt M. & S., *s.* 550 *et seq.; Jaques* v. *Company*, 66 N. H. 482; *Story* v. *Railroad*, 70 N. H. 364, 368. It is doubtful if the servant could assume the risk of injury from the master's negligence in the performance of the duty by an express contract (*Darrigan* v. *Railroad*, 52 Conn. 285); it certainly cannot be implied that he assumes it.

It is also well settled, that when the business is sufficiently extended and complicated to require it, the master owes his servants the duty of framing and promulgating reasonable rules and regulations, to the end that the servants may not injure themselves or each other in the service. This duty, like that before mentioned, is positive and personal to the master. The servants could not make such rules if they would, without usurping the functions of the master. If they do it by his authority, they represent him. For similar reasons, the law imposed upon the defendants, as the operators of a single track railroad, a duty of like character with reference to the passage of locomotives and trains to and fro over the railroad. *Darrigan* v. *Railroad*, 52 Conn. 285. They have absolute control of the road, and run locomotives and trains over it as they see fit, having due regard for the public accommodation. They know, or ought to know, to what use each portion of the road is devoted at a given time. Their employees do not have this knowledge, except as informed by them. The running of a train over the road is their act, whether it is run by the direct order of their stockholders, or by the order of their directors, superintendent, or train dispatcher. The arranging for the running of trains generally is essentially a master's function. It requires the exercise of the master's authority and discretion. It differs from the act of a conductor in taking his particular train over the road, as the act of the author of a business in instituting

and directing it differs from the act of a servant in executing its details. It is a supreme act, as distinguished from a subordinate act. It resembles in this regard the act of providing a work-place for the servant. It also resembles the formation of general rules and regulations for the conduct of business. In fact, a time-table specifying the times for the passage of regular trains may well be regarded as a general regulation of this kind, while an order for the passage of a particular train may be regarded as a special regulation of a temporary nature. See 51 L. R. A., note 546 *et seq.*; *Baltimore etc. R. R.* v. *Camp*, 31 U. S. App. 213, 240. "If there are any duties devolving upon a railroad employee, servant, or agent, from the president down, more sacredly and imperatively due from employer to employees than others, we can think of none more imperative or more sacred than the duty so to order the running of trains in a complicated system of freight and passenger transportation both ways over a single track railroad, . . . with numerous extra trains, as that collisions between opposing trains . . . . may be avoided." *Louisville etc. R'y* v. *Heck*, 151 Ind. 292, 313. The train dispatcher's duty in this case was not to assist his co-workers in the operation of the railroad and equipment furnished and maintained by the defendants, as was asserted of a train dispatcher's duty in the dissenting opinion in *Missouri etc. R'y* v. *Elliott*, 102 Fed. Rep. 96, 109, but was to assist the defendants in furnishing proper rules and orders for moving trains over their road.

Should it be said that the duty is performed with respect to special or temporary orders when, as in this case, suitable general rules are made and promulgated for the purpose, and a person is appointed to execute them, the answer is that the duty cannot be discharged in that way, any more than the duty of furnishing the servant with reasonably suitable tools for use in his service can be discharged by formulating and promulgating rules that would accomplish the object if they were obeyed. A short answer is that the duty is personal to the master and non-delegable by him to others. *Hankins* v. *Railroad*, 142 N. Y. 416; *Missouri etc. R'y* v. *McElyea*, 71 Tex. 386. In a recent work upon the law of master and servant it is said: "All regulations, it is manifest, may be divided into two categories. In one we have a statement of the method by which the employer proposes to discharge some non-delegable obligation. The other relates to matters of detail with which servants may legitimately be left to deal, except where the unusual complexity of the business organism creates a duty on the master's part to inform them in what manner they should perform their respective functions, to the end that they may avoid injuring themselves and their co-workers. The propriety of applying a dif-

ferent standard of responsibility to each of these categories is suffi-ciently obvious.   It cannot be contended, with any show of logic, that the obligation of the master in respect to the supervision of mere details is rendered more extensive by the mere fact that, under the circumstances, he was bound to systematize the execution of those details by issuing general orders for the guidance of his ser-vants.   Such general orders do not alter the character of the acts to which they may relate."   2 Labatt M. & S., *s.* 576..   The regu-lations under consideration belong to the category first mentioned; while those referred to in *McLaine* v. *Company*, 71 N. H. 294, 297, belong to the other category, and the language there used has no application to this case.   In that case, and also in *Galvin* v. *Pierce*, *ante*, *p.* 79, the injury was caused by the negligence of another servant of the common master in the performance of a servant's duty, not in the performance of the master's duty.   The negli-gent servant was a fellow-servant, not a representative of the master.

The defendants' train dispatcher, in giving the orders under con-sideration, acted by the authority and in the name of the superin-tendent.   Rules 201, 210.   The defendants' discretion relative to these matters was lodged with him.   They exercised their will concerning the movement of these trains and made it known through the agency of his will and hand.   *Hunn* v. *Railway*, 78 Mich. 513, 522; *Dobbin* v. *Railroad*, 81 N. C. 446.   He repre-sented the defendants in making the orders, not in the sense that the plaintiff represented them in setting the brake upon a car, but in the sense that their directors represent them in the exercise of discretionary power conferred upon the corporation; not because of superior rank or grade of service, but because of the masterful nature of his acts.

In *Deverson* v. *Railroad*, 58 N. H. 129, it seems to have been assumed that the train dispatcher performed the master's duty. The question was not considered, although it fairly arose upon the facts before the court.   While the case is not authority on the point, it has a tendency to show what the understanding of the profession upon it was at that time.

It is very generally held elsewhere that a train dispatcher, in performing the duties performed by the dispatcher in this case, represents the master, and that the master is responsible for his acts and negligence.   *Lasky* v. *Railroad*, 83 Me. 461; *Darrigan* v. *Railroad*, 52 Conn. 285;   *Hankins* v. *Railroad*, 142 N. Y. 416; *Lewis* v. *Seifert*, 116 Pa. St. 628;   *Flannegan* v. *Railway*, 40 W. Va. 436; *Dobbin* v. *Railroad*, 81 N. C. 446; *Galveston etc. R'y* v. *Smith*, 76 Tex. 611; *Galveston etc. R'y* v. *Arispe*, 5 Tex. Civ. App. 611; *Railway Co.* v. *Henderson*, 37 Ohio St. 549; *Louisville etc.*

R'y v. *Heck*, 151 Ind. 292; *Louisville etc. R'y* v. *Domke*, 152 Ind. 696;  *Chicago etc. R. R.* v. *McLullen*, 84 Ill. 109; *Chicago etc. R. R.* v. *Young*, 26 Ill. App. 115; *Hunn* v. *Railway*, 78 Mich. 513; *Smith* v. *Railway*, 92 Mo. 359; *Dayharsh* v. *Railroad*, 103 Mo. 570, 575; *Railroad Co.* v. *Barry*, 58 Ark. 198; *McKune* v. *Railroad*, 66 Cal. 302; *Baltimore etc. R. R.* v. *Camp*, 31 U. S. App. 213; *Oregon etc. R'y* v. *Frost*, 74 Fed. Rep. 965; *Missouri etc. R'y* v. *Elliott*, 102 Fed. Rep. 96; 2 Labatt M. & S., s. 577.   These decisions are generally put on the ground that the duty which the train dispatcher performs is the master's duty, not on the ground of the superiority of the dispatcher's rank or grade of service, or other doctrine peculiar to the jurisdiction and not recognized in this state.   In some of the jurisdictions, certainly, the law relating to the master's liability is the same as in this state—New York for example.   *Flike* v. *Railroad*, 53 N. Y. 549, 551.   In Missouri, while all the servants of a common master are regarded *prima facie* as fellow-servants (*Gowan* v. *Railroad*, 61 Mo. 528; *Blessing* v. *Railway*, 77 Mo. 410, 413), it seems from the case above cited from that state, that when a servant performs the master's duty he represents the master, and the latter is responsible for his acts.   There are a few jurisdictions in which it is held that a train dispatcher is a fellow-servant with trainmen.   It was so held in Mississippi, in *Millsaps* v. *Railway*, 69 Miss. 423, but there is no discussion of the point in the opinion; and it seems that all servants, whatever their grade or the nature of their service, are regarded as fellow-servants in that state.   *Louisville etc. R'y* v. *Petty*, 67 Miss. 255.   The same is true in Maryland, where the decisions tend toward the same holding.   *Norfolk etc. R. R.* v. *Hoover*, 79 Md. 253; *Wonder* v. *Railroad*, 32 Md. 411, 417.   But the great weight of authority, as well as of reason, establishes the plaintiff's position, that the defendants are responsible for the train dispatcher's negligence in sending the orders under consideration.

The trainmen's interpretation of the dispatcher's orders was not competent on the question of the interpretation of the defendants' rules nor on the incidental question whether or not the rules are ambiguous; but it was competent for the purpose of showing why they moved their trains as they did.   It was a part of the *res gestae*, in moving the trains.   *Deverson* v. *Railroad*, 58 N. H. 129, 131.   Exceptions numbered 1, 2, and 3, to the exclusion of evidence, are sustained for this reason.   No ground has been suggested or is found on which exception numbered 4 can be sustained, and it is overruled.

*Exceptions sustained: nonsuit set aside.*

WALKER, J., concurred in the result: the others concurred.